Affirmed; Opinion of January 9, 2007 Withdrawn; Corrected Opinion filed
February 1, 2007








 

Affirmed;
Opinion of January 9, 2007 Withdrawn;
Corrected Opinion filed February 1, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00204-CV

____________

 

TH INVESTMENTS, INC., Appellant

 

V.

 

KIRBY INLAND MARINE, L.P. AND PORT
OF HOUSTON AUTHORITY OF HARRIS COUNTY, TEXAS, Appellees

 



 

On Appeal from the 269th
District Court

Harris County, Texas

Trial Court Cause No. 03-12846

 



 

C OR R E C T E D   O P I N I O N

We originally issued our opinion affirming the trial court=s judgment on
January 9, 2007.  On Kirby Inland Marine, L.P.,=s unopposed motion
to correct the opinion, we withdraw our previous opinion and substitute this
corrected opinion in its place.[1]








This appeal by a private landowner, TH Investments (ATHI@) against the Port
of Houston Authority and Kirby Inland Marine, asks us to decide who owns two
tracts of property on the Old River and the San Jacinto River. As will
be discussed in greater detail below, both rivers are subject to the tides.  Three
broad issuesCand many sub-issuesCare presented.

The first two issues pertain to the first tract, Tract 1. 
We first must determine whether the State has gained ownership of it because
the property is covered by shallow tidal waters.  Second, we are asked to
decide if the location the trial court chose for the southern boundary of Tract
1 coincides with the boundary set by the original 1838 survey of the property. 
The third issue involves Tract 2.  We are asked to decide whether THI owns
Tract 2.  In the body of the opinion we will address the many sub-issues, but
for purposes of this overview, we hold the following regarding the three broad
issues.  First, the State did gain ownership of Tract 1 because it became
submerged as a result of indistinguishable effects of erosion and subsidence. 
Therefore, the trial court correctly ruled that the Port owns Tract 1.  Second,
the southern boundary set by the trial court for Tract 1 is the same as
boundary set by the original 1838 survey.  Third, as the trial court held, THI
does not own Tract 2.  In short, we affirm the trial court=s rulings.

Factual and Procedural Background








The property lies near the confluence of the Old River and
the San Jacinto River, east of Houston near Channelview, in Harris County,
Texas.  Tract 1, which historically consisted of 27 acres, is now a Aflat,@ almost completely
submerged beneath the waters of the two rivers.[2] 
Occasionally, Tract 1 becomes exposed during the fall and winter months during
low tide when a north wind blows.  Tract 2 is a small parcel of land to the
east consisting of 6.1 acres variously described as an island or a strip of
riverbank. The two tracts are sometimes identified by their acreage as Athe 27 Acre Tract@ and Athe 6.1 Acre
Tract.@  The area around
the property is subject to significant commercial maritime use, as well as
occasional use for recreational purposes by pleasure craft and for fishing.  

What follows are the relevant facts framing the dispute;
more specific details are developed in the discussion of the issues.

THI=s Purchase of the
Property

In November 2002, THI acquired record title to Tract 1 by a
non-warranty deed from the record owners, known collectively as the ACarter Heirs,@ and acquired
Tract 2 by quitclam deed from the Carter Heirs.  The contract of sale for Tract
1 included an AAddendum for Coastal Area Property,@ which provided to
THI the following notice:

NOTICE REGARDING COASTAL AREA
PROPERTY

1.       The real property described in and
subject to this contract adjoins and shares a common boundary with the tidally
influenced submerged lands of the state.  The boundary is subject to change
and can be determined accurately only by a survey on the ground made by a
licensed state land surveyor in accordance with the original grant from the
sovereign.  The owner of the property described in this contract may gain or
lose portions of the tract because of changes in the boundary.

***

3.       State law prohibits the use,
encumbrance, construction, or placing of any structure in, on, or over
state-owned submerged lands below the applicable tide line, without proper
permission.

4.       The
purchaser or grantee is hereby advised to seek the advice of an attorney or
other qualified person as to the legal nature and effect of the facts set forth
in this notice on the property described in and subject to this contract. 
Information regarding the location of the applicable tide line as to the
property described in and subject to this contract may be obtained from the
surveying division of the General Land Office in Austin.

(emphasis
added).  When he signed the contract for sale, THI=s president, Earl
Thrift, neither read the deeds himself nor engaged counsel to do so.








When THI purchased the land from the Carter Heirs in 2002,
the Carter Heirs also assigned to THI a lease with Kirby Inland Marine, L.P. 
THI, which intended to start its own barge fleeting business, then informed
Kirby that it would either have to vacate the area and remove any improvements
made or start paying $35,000 monthly in rent.[3] 
When Kirby did not agree to THI=s demands, THI terminated the lease and
threatened to evict Kirby. 

The Lawsuit

As a result of THI=s actions, Kirby
filed suit against THI to enjoin it from interfering with Kirby=s business
operations and to obtain a declaratory judgment that the State of TexasCnot THICowned Tract 1.[4] 
Kirby later joined the Port, asserting that the State conveyed ownership of the
property to the Port by statute.[5] 
Eventually, the posture of the case evolved into, primarily, an action by THI
on its counterclaims and cross-claims for trespass to try title to Tract 1 and
Tract 2.  THI claimed record title to both tracts, and Kirby claimed ownership
of Tract 2.  The Port claimed that it owned any part of Tract 1 or 2 that was
below mean high tide or was raised above mean high tide by artificial means
or Aself-help.@








The trial court tried the issues in two phases.  Phase 1
was a bench trial with THI as plaintiff on its trespass to try title action
involving Tract 1; the parties presented evidence on the ownership and
boundaries of the tract.  The trial court heard two weeks of evidence from
numerous witnesses and received many exhibits into evidence.  At the conclusion
of the trial, the court entered detailed findings of fact and conclusions of
law.  It found that THI never owned Tract 1 and that ownership of Tract 1
passed to the Port, as successor to the State of Texas, because the tract became
submerged below the line of mean high tide.  The court also set the southern
boundary for Tract 1.

Following the bench trial, Phase 2 proceeded on Tract 2. 
The court considered the parties= cross-motions for
summary judgment as to ownership of the tract.  The court granted the Port=s and Kirby=s motions for
summary judgment on THI=s claim of record title to Tract 2,
denying THI=s claim of ownership.  The trial court did not
determine who owned Tract 2; it held only that THI did not own it.

At the conclusion of phase 2, the trial court signed a
final judgment incorporating its earlier orders and attaching as an exhibit its
findings of fact and conclusions of law entered after Phase 1.  This appeal
followed.

I.        Part 1: 
Ownership of Tract 1

We turn now to the first general area of contention, the
ownership of Tract 1.  In Part 1 of its brief, THI claims that it, not the
Port, owns Tract 1 because this case falls within an exception to the general
rule that the State owns all property covered by tide waters.  This claim is
based on two concepts it argues apply here and on several allegedly erroneous
findings of fact the trial court entered.  The two concepts are that (1)
private owners can own property under tide waters, and (2) if the property is
submerged under tide waters because of subsidence, the general rule that the
state owns submerged lands does not apply.  

THI
interweaves these two concepts throughout six issues: 

(1)       the trial court erred by holding that THI lost its riparian
land to the Port as the land subsided and most of it became shallowly submerged
beneath the waters of the Old River; 

(2)       the trial court erred by not following Coastal Industrial
Water Authority v. York, 532 S.W.949 (Tex. 1979); 

(3)       the trial court=s
ruling constitutes a taking in violation of the Texas and United States
Constitutions; 








(4)       no evidence or insufficient evidence supports the trial court=s finding reciting that the extent to which subsidence
versus erosion contributed to the submergence of Tract 1 cannot be determined,
or alternatively, the trial court misplaced the burden of proof and applied
incorrect legal standards; 

(5)       no evidence or insufficient evidence supports the trial court=s findings that a boundary of Tract 1 described as Athe meanders of Old River@ cannot now be identified or located, and that the
tract cannot be distinguished from the bed of Old River, or alternatively, the
trial court applied the wrong standard; and 

(6)       no evidence or insufficient
evidence supports the trial court=s findings that the entirety of Tract
1 became submerged at some time in the past and that the portions of the tract
that now lie above mean high water re-emerged as the result of the deposit of
dredge spoils by Kirby and its predecessor, Western Towing. 

Before we address THI=s specific issues
and the two concepts underlying them, we will review generally the law that
applies to riparian and littoral owners.[6]

A.      Tract 1 is
Under Tidal Waters which Typically are Owned by the State.

1.       The State
Presumptively Owns Lands Lying under Tidal Waters.








Generally, A[t]he soil covered by the bays, inlets,
and arms of the Gulf of Mexico within tidewater limits belongs to the State,
and constitutes public property that is held in trust for the use and benefit
of all the people.@  Lorino v. Crawford Packing, 142 Tex. 51, 175
S.W.2d 410, 413 (1943).  Section
11.012(c) of the Texas Natural Resources Code echos the Lorino holding: AThe State of Texas
owns the water and the beds and shores of the Gulf of Mexico and the arms of
the Gulf of Mexico within the boundaries provided in this section, including
all land which is covered by the Gulf of Mexico and the arms of the Gulf of
Mexico either at low tide or high tide.@  Tex. Nat. Res. Code ' 11.012(c).  A[N]avigable waters
and streams[7]
are reserved to the State for the use of the public generally, and no one
should have an exclusive right to the enjoyment of such property, unless and
until the Legislature has granted such right.@  Lorino,
175 S.W.2d at 414.  Thus, two presumptions arise regarding submerged lands: (1)
they are owned by the State and (2) the State has not acted to divest itself of
title to them.  See, e.g., Lorino, 175 S.W.2d at 414; City
of Galveston v. Mann, 135 Tex. 319, 143 S.W.2d 1028, 1033 (1940); State
v. Bradford, 121 Tex. 515, 50 S.W.2d 1065, 1069 (1932); Landry v.
Robison, 110 Tex. 295, 219 S.W. 819, 820 (1920); City of Galveston v.
Menard, 23 Tex. 349, 392 (1859).  

Addressing
these presumptions, the Lorino court explained that Aland under navigable waters is
withdrawn from the general provisions of the statutes conferring upon the Land
Commissioner the right to contract for the sale or lease thereof.@  Lorino, 175 S.W.2d at 413. 
Instead, only the Texas Legislature may convey submerged tidal lands.  See
id. at 414.  The Court explained the reason for this rule as follows: 

It has always been the policy of
the State to dispose of ordinary public lands to settlers, and under usual
circumstances it may be presumed that the State has parted with title; but
navigable waters and streams are reserved to the State for the use of the
public generally, and no one should have an exclusive right to the enjoyment of
such property, unless and until the Legislature has granted such right. 
Therefore, it has been the policy of the State to retain title to lands covered
by navigable waters, and the presumption is that there has not been any act of
the State divesting itself of title.   

Id. at 414 (citing Bradford,
50 S.W.2d at 1069). 








The public policy that informs the presumption of State
ownership is also reflected in the Texas Legislature=s 1927 conveyance to the Port=s predecessor, a political
subdivision of the State.  The Legislature conveyed to the Port=s predecessor all of the submerged
lands Aas now or hereafter located@ in the areas presently at issue,
including those lands submerged beneath the waters of the Old River and the San
Jacinto River.  See Act of April 5, 1927, 40th Leg., R.S., ch. 292, 1927
Tex. Gen. Laws 437, 438.  This conveyance included Aall the submerged lands lying and
being situated under the waters of . . . San Jacinto River . . . [and] . . .
Old River . . . so far up said streams as the State may own same, together with
all lands lying and being situated under the waters of Old River . . . and all
other tidal flats or overflow land adjacent to or appurtenant to the above
mentioned streams . . . . as now or hereafter located . . . .@  Id. at 438, ' 1.[8] 
The Legislature directed the Port to administer these lands Afor public purposes and the
development of commerce only@ in connection with the development of the Port of Houston.  Id. 
The Legislature also directed that the Port was not at any time to Agive or alien said lands or any part
thereof@ and empowered the Port to Aabate and remove any and all
encroachments or structures of any kind now or hereafter existing on such
property.@  Id. at 439, '' 2, 3.

2.       Unchallenged
Findings of Fact State that the Land is Under Tide Waters.








The
trial court entered a fact finding, unchallenged by THI, that the waters of Old
River and the San Jacinto River are navigable.[9] 
Also unchallenged by THI is the trial court=s finding that the land is subject to
the ebb and flow of the tide, is within the tidewater limits of the Gulf of
Mexico, and is tidally influenced:

The water over, around and in the area of the 27-Acre
Tract is subject to the ebb and flow of the tide,  being within the tidewater
limits of the Gulf of Mexico.  The waters of Old River and the San Jacinto
River likewise are tidally influenced in the area in question.  The facts in
the record demonstrate the area is tidally influenced.  The parties likewise
stipulated the area is tidally influenced.

3.       The Boundary
between Public Submerged Tidal Lands and Private Lands Derived from a
Common-Law Grant is Mean High Tide. 

The Texas Supreme Court long ago announced the boundary
between State and private ownership of submerged tidal lands.  For common law
land grants, the boundary is the line of mean high tide; for Spanish or Mexican
grants, it is the line of mean higher high tide.  See Luttes v. State,
159 Tex. 500, 324 S.W.2d 167, 175 (1958) (civil law); Rudder v. Ponder,
156 Tex. 185, 293 S.W.2d 736, 741 (1956) (common law); see also Kenedy Mem=l Found. v.
Dewhurst, 90 S.W.3d 268, 270 (Tex. 2002) (applying rule of Luttes to
locate shoreline boundary).  Because the property at issue passed under
a common law grant, the boundary line that applies here, in the absence of any
exception, is the line of mean high tide.[10] 









This boundary is not static.  The boundary moves because
the line of the tide moves over time, and as that line moves, so does the
boundary between State-owned submerged lands and privately owned uplands.  See
Brainard v. State, 12 S.W.3d 6, 17 (Tex. 1999) (ATexas follows the
general rule that when the location of the margin or bed of a body of water
that constitutes the boundary of a tract of land is gradually and imperceptibly
changed or shifted by accretion, reliction, or erosion, the margin or bed of
the body of water, as so changed, remains the boundary line of the tract, which
is extended or restricted accordingly.@); Coastal
Indus. Water Auth. v. York, 532 S.W.2d 949, 952 (Tex. 1976) (AThe general rule
is that a riparian or littoral owner acquires or loses title to the land
gradually or imperceptibly added or taken to or from his fast bank or shore.@); City of Port
Isabel v. Mo. Pac. R. Co., 729 S.W.2d 939, 942 (Tex. App.CCorpus Christi 1987, writ ref=d n.r.e.) (A[T]he location of
the shoreline, wherever it may be at any given time, represents the boundary of
a littoral owner=s property.@); City of
Corpus Christi v. Davis, 622 S.W.2d 640, 643 (Tex. App.CAustin 1981, writ ref=d n.r.e.) (AWith respect to
the landward advance of the line of mean high tide, the Supreme Court has written
that if the sea encroaches and the upland owner loses his land, he has no
redress.@) (citing State
v. Balli, 144 Tex. 195, 190 S.W.2d 71, 100 (1944)).

The tide
is not the only factor changing the boundary.  It also can be changed by nature=s forcesCprimarily waterCthat add to or subtract from a body
of land.  Additions to land generally are created by accretion or reliction.  Brainard,
12 S.W.3d at 17.  With accretion, land increases gradually and imperceptibly
when water deposits solid material so that land once covered by water becomes
dry.  Id.  Reliction occurs when previously submerged land is uncovered
by permanently receding water.  Id.  Decreases in tidal lands generally
are caused by erosion, which  gradually and imperceptibly wears away the land. See
York, 532 S.W.2d at 952.  All of these processes may cause a riparian or
littoral owner to gain or lose title to the land.[11] 


B.      This Case
Does Not Fall Under Any Potential Exceptions or Case Law THI Cites.








With
these general legal principals in mind, we turn now to the exceptions and case
law THI claims apply.  THI claims this case falls within one of several
exceptions that would allow it to continue to own land submerged under tide
waters.  First, THI refers us to at least one case in which the State has
conveyed land to an individual.  Second, THI relies heavily on Coastal
Industrial Water Authority v. York and its holding that an individual owned
property beneath the San Jacinto River that became submerged because of
subsidence.  THI also cites us to a handful of appellate court opinions it
claims allowed individuals to continue owning land that became submerged.[12] 


We
consider these claims below.  However, as we explain, we disagree that either
claimed exception applies here, and, in light of Luttes, Rutter, Lorino,
Brainard, and Kenedy Memorial FoundationCthe seminal cases explaining the
boundaries between state-owned and privately owned landCwe find the cited case law either of
questionable validity or distinguishable.  See Luttes v. State, 159 Tex. 500,
324 S.W.2d 167 (1958); Rudder v. Ponder, 156 Tex. 185, 293 S.W.2d 736
(1956); Lorino v. Crawford Packing, 142 Tex. 51, 175 S.W.2d 410 (1943); Brainard
v. State, 12 S.W.3d 6 (Tex. 1999); Kenedy Mem=l Found. v. Dewhurst, 90 S.W.3d 268 (Tex. 2002).

1.       Private
Individuals Can Own Land Conveyed to Them by the State Even When the Land is
Under Water.

a.       Submerged
property conveyed by the State can be owned by a private individual if the
conveyance contemplated submerged land.

Property conveyed by the State to an individual can remain
privately owned even if it is submerged under tide watersCbut only under
very special circumstances in which the State manifested its intent that the
private landowner continue to own the property even if submerged.  








An example of a case in which the Texas Supreme Court found
that a private individual owned shallowly submerged flats is City of
Galveston v. Menard, 23 Tex. 349 (1859), involving Galveston Island,
located in the tidal waters of Galveston Bay.  Menard, as the original grantee
of the state, claimed that he owned the submerged flats because they were sold
to him through a legislative grant by the Republic of Texas in 1836 and through
a patent issued in 1838.  Id. at 391.  The City claimed that the 1836
grant did not include the flats, and that they remained in republic and state
ownership until a later date, when the Texas Legislature conveyed the flats to
the City.  Id.

The Court recognized the well-established common-law
doctrine that an ordinary grant of land upon a bay, where the tide ebbs and
flows, Adoes not convey
the shore or any of the land of the bay covered with water.@  Id. at
396.  But, based on the object of the grant, its location, and the acts of the
contracting parties, the Court determined that the Legislature intended to
convey the submerged flats to Menard, specifically to encourage the
construction of a port of entry for commercial activities and promote the
building of a city on Galveston Island.  Id. at 398B408.  Menard=s rights were
limited only by the City=s right to build and regulate the wharves
and to open, improve, and use streets across the property out to the channel.  Id.
at 408.

b.       Tract 1
was dry land when conveyed by the State.

This appeal does not involve a conveyance like Menard. 
Although THI attempts to
overcome the presumption of state ownership by showing that the Republic of
Texas patented Tract 1 and other property into private ownership in 1845, the
only land that THI=s predecessors received from the patent was a grant of dry
land.  THI does not contend that the State granted to its predecessors any
submerged lands.  Indeed, THI states in its briefing that A[i]t is undisputed
that Tract 1 was dry land at the time of the . . . Grant.@  One may not
convey more than one owns, and in this case, it is undisputed that the 1845
patent did not convey any submerged property.  Nor do we find any evidence that
the grant contemplated ownership by an individual if the property became
submerged.  Therefore, the patent does not overcome the presumption of state
ownership.  See Lorino, 175 S.W.2d at 414; Mann, 143 S.W.2d at
1035; City of Port Isabel, 729 S.W.2d at 942B43.








Thus, although private individuals can own submerged
property if the State=s conveyance contemplated private
ownership of submerged lands, the State=s patent
concerning Tract 1 did not reflect an intent that it remain in private
ownership if it became submerged.[13]

2.       York
and Any Exceptions it Creates Do Not Apply.

We now
turn to THI=s claim that Coastal Industrial Water Authority v. York, 532
S.W.2d 949 (Tex. 1979), creates an exception to the general rule of state
ownership of submerged lands, that York controls the outcome of this
appeal, and that the trial court erred when it refused to apply it.  We
disagree and explain below that York is distinguishable from this case
in several important respects. 

a.       Two
defining and narrowing facts in York distinguish it from this appeal.  








In York,
the Water Authority sought to condemn York=s land near the San Jacinto
Monument.  532 S.W.2d at 951.  A survey of York=s property in 1950 showed 28.083
acres above the water level, but when the Water Authority commenced
condemnation in 1970, only 24.73 acres lay above waterCa difference of 3.353 acres.  Id. 
York=s land indisputably was in an area
where the land surface had been slowly subsiding during several decades because
area industries and municipalities had removed enormous amounts of underground
water.  Id.  As the land subsided, the adjacent waters encroached upon
and submerged the land.  Id.  York argued, and the lower courts agreed,
that the Water Authority should compensate York for the all of the acreage
originally conveyed to him, including the 3.353 acres that had become
submerged. Id.

As the York
court explained, the general rule is that a riparian or littoral owner loses
title to land that is worn away gradually by erosion, and gains title to land
added gradually by accretion.  Id. at 592.  However, the Court
distinguished subsidence from these processes, stating that subsidence is not Aan ordinary hazard of riparian
ownership; it is not the result of the force of the waters which takes from
some owners and gives to others.@  Id. at 954.  Determining
that no conflict between private and public interests existed under the facts
before it, the Court concluded that it was Aconsistent with the interests of all
to permit the riparian owner to protect his landCrather than to watch helplessly as
his boundary retreats.@  Id.  Thus, because York=s property became submerged below the
water level of the Houston Ship Channel solely as a result of subsidence, the
Court held that York owned the submerged land as of the date the Water
Authority had sought to take York=s property by condemnation.  Id. 
Consequently, the Water Authority was required to compensate York for the
submerged property.  See id.

At least two courtsCincluding the
Texas Supreme Court itselfChave recognized the very limited nature of
the York holding.  See Brainard, 12 S.W.3d at 20 (ANonetheless, we
find nothing in York=s limited holding that precludes the
operation of the rules of accretion, reliction, and erosion to artificially
influenced changes in a river channel.@); Davis,
622 S.W.2d at 643 (AAlthough the [York] Court
reaffirmed the rules with respect to property loss and gain due to erosion and
accretion, those rules were not employed by the Court in its determination that
the riparian owner held title to the submerged land since there was no erosion
involved, only subsidence.@).  As we discuss, statements made by the York
court itself limit the opinion  to such a degree that it does not control
our decision here, and the trial court appropriately did not apply it.  

 








(1)     York
did not involve land covered by tidal waters.

The
first, and most important, limitation of York is that it did not involve
tide waters.  The York court expressly stated it assumed that the tide
was of no effect:  AThe testimony of the surveyor witnesses indicates that the
level of the water upon the York land does not fluctuate with the ebb and flow
of the tide, and we will assume that the tide has no effect at this
point.@  Id. at 951 (emphasis
added).  In footnote 1, the court explained that the effect of the tide on the
legal outcome of the case simply was not an issue raised by the parties:  AThe parties have not, at any point in
this litigation, made any reference to the fact or legal effect of the tide. 
For this reason, the court=s opinion is restricted to the issues presented by the
peculiar facts of this record and the contentions of the parties.@  Id. at 951 n.1 (emphasis
added).  Author Justice Reavley added:  AThe writer of this opinion, speaking
personally, chooses to emphasize the narrowness of the holding and to warn
against any misinterpretation of its effect upon the boundary of private
ownership to lands within reach of the tide.@  Id. (emphasis added).[14] 
Although the intermediate appellate court=s opinion in York did state
that the property was subject to tide water, the Supreme Court expressly
assumed no tide water covered the property.  See id. at 951.

(2)     York
involved only subsidence and not other forces.








A second
important distinction between this appeal and York, as we explain below,
is that the York property was submerged due to subsidence alone.  No
erosion was involved.  In fact, the York court recognized that the
result could have been different if other forces, such as erosion, had affected
the property.  The Court noted A[i]t might be expected@ that part or all of the contested
acreage would have been eroded by the current of the water Aso as to leave this three acre area
indistinct from the bed of the ship channel.@  Id. at 951B52.  Had that happened, the Court
acknowledged that Aownership would have been lost to the riparian owner . . .
and passed to the City of Houston under the authorities to be discussed.@  Id. at 952.  However, as the
case was presented to the Court, Athere has been no displacement of the
submerged land in relation to the bed of the ship channel.@  Id.[15]

In
short, the two facts that define York, especially for comparison with
this case are these: (1) tide waters did not cover the York property,[16]
and (2) York involved only subsidence without any erosion. 

b.       The
trial court=s findings distinguish this appeal
from York.

Several
of the trial court=s findings relate directly to York and whether York
controls this case.  According to the Port, if we uphold these findings, York
does not control this case.  We will consider first the court=s findings that the boundary of Tract
1 cannot be distinguished from the Old River and that the boundary on one side
of the property, which followed Athe meanders of the Old River,@ cannot be identified now.[17] 
We then will turn to the findings reflecting the court=s decision that one cannot determine
the extent to which subsidence, as opposed to erosion, contributed to the
submergence of Tract 1.








THI
claims these findings are both legally and factually insufficient.  A trial
court=s findings are reviewable for legal
and factual sufficiency by the same standards that are applied in reviewing
evidence supporting a jury=s answer.  Catalina v. Blasdel, 881 S.W.2d 295, 297
(Tex. 1994).  In determining whether legally sufficient evidence supports the
trial court=s findings of fact, we consider the evidence in the light most favorable
to the challenged finding and indulge every reasonable inference that would
support it.  See City of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex.
2005).  We must credit favorable evidence if a reasonable factfinder could and
disregard contrary evidence unless a reasonable factfinder could not disregard
it.  See id. at 827.  We must determine whether the evidence at trial
would enable a reasonable and fair‑minded person to find the facts at
issue.  See id.  The factfinder is the sole judge of the credibility of
the witnesses and the weight to give their testimony.  See id. at 819. 
Evidence is conclusive only if reasonable people could not differ in their conclusions. 
See id. at 816. 

When a
party attacks the legal sufficiency of an adverse finding when it had the
burden of proof on the issue,[18] it must
demonstrate on appeal that the evidence establishes, as a matter of law, all
vital facts in support of the issue.  Dow Chem. Co. v. Francis, 46
S.W.3d 237, 241 (Tex. 2001).  We first examine the record for evidence that
supports the finding, while ignoring all evidence to the contrary.  Id. 
If no evidence supports the finding, we then examine the entire record to
determine if the contrary proposition is established as a matter of law.  Id. 
We may sustain the issue only if the contrary proposition is conclusively
established.  Id.








In
reviewing a factual insufficiency point, we consider all the evidence presented
at trial.  Plas‑Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445
(Tex.1989).  When a party attacks the factual sufficiency of an adverse finding
on an issue on which it has the burden of proof, it must demonstrate on appeal
that the adverse finding is against the great weight and preponderance of the
evidence.  Dow Chem. Co., 46 S.W.3d at 242.  We may set aside a verdict
only if the evidence is so weak or if the finding is so against the great
weight and preponderance of the evidence that it is clearly wrong and unjust.  Id. 
Unchallenged fact findings are binding on this Court unless the contrary is
established as a matter of law or there is no evidence to support the finding. 
McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986).

To
resolve these issues, we examine the evidence presented by both side=s experts, who testified extensively
concerning their opinions. 

(1)     The
boundaries of Tract 1 cannot be located.

We turn
now to consider the trial court=s finding that the boundaries of Tract 1 could not be
located.   Before addressing the fact findings THI challenges, we set out those
THI does not challenge:

!                  
AA 1916 topographical map (Common
Exhibit 29) shows that the land at the location in question was generally in
the shape of what the parties and witnesses called a >Rabbit=s Head.=  No such shape can now be identified
at the location in question.  The shape of the tract surveyed by THI=s surveyor, Bill Merten, is called >Tract 1= and differs materially in shape from
the historic >Rabbit=s Head.=@

!                  
AAt present, there exists at the
location what the parties and witnesses have called a >Flat=  This Flat is typically covered by
tidal waters but is occasionally uncovered, as shown by many of the
photographic exhibits.  While there exists a drop off to the north of the Flat,
the evidence shows that this was created by dredging.  The Flat extends to the
south beyond the boundaries claimed by THI for the 27-Acre Tract.  The topography
of the Flat is generally flat, with minor differences in elevation.@

THI=s expert testified that he could
locate the border described as Athe meanders of the Old River.@  The Port=s and Kirby=s expert testified, on the other
hand, that she could not find the border of Tract 1 defined by the meanders of
the Old River.  The dispute on this issue turned on whch expert used the proper
method for locating the meanders.  We first review the method THI=s expert used to determine the
northern and western boundaries of Tract 1.








THI=s surveyor, William Merten, is a
Licensed State Land Surveyor (ALSLS@)[19] in Texas who
surveyed the property for this litigation.  THI hired Merten to survey all of
Tract 1, but for purposes of this issue the only portion of Merten=s survey in dispute is his survey of
the northern and western boundaries of Tract 1Cthe Ameanders of Old River.@ 

Merten
surveyed the area to the north and east of Tract 1 with the goal of locating
the bank of the Old River as it was before Kirby=s predecessor dredged it out.  To
find this portion of the bank, Merten visually inspected the site, viewed
photographs, and reviewed a Corps of Engineers dredging permit.  He described
his methodology as an estimate of where he believed the historic meander
shoreline should have been.  Merten=s Athinking was where will the line be
if the barges were not there, if the area was not dredged.@  So, he Acame up with an estimate of - - where
you see here of where I believed the natural line would be if all this man-made
activity had not occurred.@  Thus, Merten drew the line along the north and northeast in
the dredged area based on his belief of where he believed the natural, now
submerged, meander line should have been.  When asked at trial whether a
boundary existed on the river bottom today that someone attempting to retrace
Merten=s steps could find, Merten responded,
AOn the river bottom, no.@

To
survey the boundary to the north and west, Merten employed a Aprobing@ technique in which he walked into
the water over the submerged land as he probed the bottom to locate the
purported submerged bank of Old River.  Merten described the Aprobing@ as wading through the water while
hanging onto a boat.  He felt the bottom with his feet, alternately stepping
from hard to soft ground, while taking Global Position System (AGPS@) readings at intervals so that he
could connect them and draw a line.  The hard ground he assumed was the former
bank of Old River.  








Merten
admitted that he had never before used Aprobing@ to locate a submerged boundary
line.  Merten also acknowledged that there were no authoritative sources
stating that probing was an accepted method, and even offered (perhaps
unwittingly) that A[w]e are on uncharted grounds here.@  None of appellees= witnesses testified that probing was
an accepted procedure to identify a submerged boundary line in a title dispute.[20]


The Port=s surveyor, Nedra Foster, also an
LSLS, testified that, given the existing site, the only way to survey the
meanders today was to survey the line of mean high tide.  She explained that
the line of mean high tide is the proper line to use because the chain of title
for Tract 1 is derived from a common-law grant located within a tidally
influenced area. Foster=s mean high water survey reflected that the only existing
meander lines between upland and water are the present meanders of Old River
and the San Jacinto River around an island, which is what THI calls Tract 2. 
Foster testified that if she literally followed an 1896 deed description, the
only land above water remaining at the site would be a small site less than one
tenth of an acre, described as the ALittle Thumb.@  She also identified two other Avery small portions@ of emergent land outside of the
original 27-Acre Tract.  Merten=s own mean high tide survey substantially agreed with Foster=s survey.  








THI
contends that Merten=s survey of these boundaries provides undisputed evidence
that a licensed surveyor could and did identify and locate the current Asubmerged boundaries@ of Tract 1 along the meanders of Old
River, while the Port=s surveyor, Nedra Foster, did not even try to survey these
boundaries.[21]  THI
maintains that, if it is legally permissible for a surveyor to survey the
boundaries of private land that is shallowly submerged due to subsidence, then
its surveys stand as undisputed evidence of the boundary. Thus, while THI
complains about the trial court=s fact findings, it frames the issue as one of law.  

We agree
with THI to the extent that the issue is one of law.  The Texas Supreme Court,
in discussing the determination of a waterfront boundary in Kenedy Memorial
Foundation, stated, ABut here, as in Luttes, the exercise is made no easier
by basing the boundary determination on a surveyor=s subjective observations of the
terrain.  For certainty in land titles, it is important to have a rule, and the
civil law as interpreted in Luttes provides one.@  90 S.W.3d at 284.  Thus, the
determining question here is not whether a surveyor could or did mark
lines for the northern and western Ameander@ boundaries of the tract, but whether
the surveyor properly surveyed lands bounded and covered by tidally-influenced
waters.  As our discussion of the relevant law makes clear, the only valid way
to survey such land is to survey the line of mean high tide.  See Luttes, 324 S.W.2d at
175; Rudder, 293 S.W.2d at 741.  THI argues that its land became submerged as a result of
subsidence and therefore, based on the Texas Supreme Court=s holding in York, it is
legally permissible to survey the submerged property.  But, as we discuss in
greater detail below, we reject THI=s argument that subsidence alone is
responsible for the submergence of Tract 1, and therefore we reject its
attempted survey of the submerged property as legally insufficient.








Moreover,
in a trespass to try title case, the general test for determining the sufficiency
of a description of land is whether the tract can be identified with reasonable
certainty.  Zobel v. Slim, 576 S.W.2d 362, 369 (Tex. 1978).  The 1896
Magee/Hudson deed provides a metes and bounds description that includes calls
to the meanders of Old River.  A[M]eander lines of surveys of land adjacent to or bounding
upon a stream are not to be considered as boundaries, but they are to follow
the general course of the stream, which itself constitutes the real boundary.@  Stover v. Gilbert, 112 Tex.
429, 247 S.W. 841, 843 (1923).  Thus, there can be no Ameanders@ or distinct boundaries created by
the course of Old River in this case when the waters of Old River cover the
site.  The evidence demonstrated that Merten=s hypothesized survey outlineCbased on purportedly submerged banks
and his belief as to where the natural boundary would have been but for
dredgingCis not reliable.  We therefore agree
with the trial court=s finding that the northern and western boundaries of Tract
cannot be identified or located today.  We also find the evidence is legally
and factually sufficient to support the trial court=s finding that Tract 1 cannot be
distinguished from the surrounding area and the bed of Old River.

(2)     The effect
of subsidence cannot be assessed.

THI also
complains that the trial court erred when it held that no one could assess the
extent to which subsidence and/or erosion caused Tract 1 to become submerged. 
The trial court=s finding is set out below:   

The physical evolution of the 27 Acre Tract over time
was caused by various natural and man-made forces, including subsidence,
erosion, deposition, accretion, flooding, tidal inundation, sea level rise,
dredging, dredge spoil dumping, boat wakes, storm surges, and the location of
sunken barges and barge fleeting in The Big Empty.[22] 
The effects of all of these varied forces on the site cannot be separated, and
the extent to which subsidence versus erosion contributed to the submergence
cannot be determined.

THI attacks this finding,
claiming that the evidence conclusively shows that subsidence caused the
submergence.  Alternatively, THI contends the trial court misplaced the burden
of proof and applied incorrect legal standards, and the evidence is
insufficient to support the finding.  To resolve the issue, we examine the
evidence presented by both sides= experts, who testified extensively
concerning their opinions.

(i)      The
experts did not agree.








THI
relied primarily on its experts Robert Gabrysch and Dr. William Dupre. 
Gabrysch is a hydraulic engineer and groundwater hydrologist with an extensive
background in land surface subsidence in the Houston/Galveston area.  Dr. Dupre
is an associate professor at the Department of Geosciences at the University of
Houston, where he has been a member of the faculty for twenty-eight years.  His
stated areas of expertise are in sedimentology, geomorphology, and photo
interpretation. 

Gabrysch
testified that his studies and physical inspection of Tract 1 led him to
believe the amount of subsidence was probably between eight and nine feet.  Dr.
Dupre concurred and ultimately concluded that but for man-made subsidence
resulting in groundwater withdrawal from the subsurface, Tract 1 would not be
submerged today.  Dr. Dupre supported his conclusion with (1) photographs of
the area taken over the past 75 years showing the shape of the tract
consistently shrinking and gradually sinking beneath the water, (2) historical
photographs and inspection of the land showing the preservation of natural
channels or splays over time, and (3) the presence of buried tree trunks on the
tract, which he opined would have been undercut and washed down river had the
land been eroded away.








Dr.
Douglas Sherman testified on behalf of the Port and Kirby.  At the time of
trial, Dr. Sherman was a tenured professor and head of the Department of
Geography at Texas A&M University, specializing in geomorphology and
sedimentology.  Dr. Sherman refused to adopt Gabrysch=s opinion of the amount of subsidence
that had occurred in the area of Tract 1, and he also disagreed that subsidence
alone could account for the changes in the shape of the site over time.  In
support of his opinion, he pointed out that the historic shape of the property,
which the parties referred to as a Arabbit=s head,@ could no longer be identified.  He
explained that A[i]f subsidence were the only force of change at this site,
we would still see that rabbit=s head preserved.  It would just be deeper.@  Dr. Sherman also disagreed with Dr.
Dupre=s opinion that subsidence alone
caused the tract=s submergence.  Further, Dr. Sherman testified that both
subsidence and erosion were acting on the property, and he concluded that even
if he were to exclude the effects of subsidence from his analysis of the
submergence of the tract, most, if not all, of the property would still be
submerged.  According to Dr. Sherman, the area was transformed from a rabbit=s head to a submerged and featureless
flat by a number of forces, including erosion, deposition, and human activities
such as dredging, as well as subsidence.  Viewing all the circumstances, Dr.
Sherman testified that he could not quantify the degree to which the various
causes impacted the site.

The
parties= experts also disagreed concerning
the reasons why the tract was not submerged to a depth consistent with the
amount of subsidence in the region.  In 1916, most of the original 27 Acre
Tract was less than two feet in elevation above mean sea level.  THI=s experts contended the tract had
subsided approximately eight feet, so presumably the tract should have dropped
to approximately six feet below sea level.  However, evidence showed depths of
one to one and one-half feet below sea level, the deepest measurement being 1.7
feet.  Dr. Dupre testified that, next to subsidence, the most influential
process at work on the tract was the deposit of sediment onto the land as water
moved across it.  He opined that more sediment was deposited than was lost to
erosion, resulting in a net accretion (deposit of sediment) on Tract 1 of one
and one-half feet to five feet in the area.  

However,
Dr. Sherman, the Port=s and Kirby=s expert, testified that four or more feet of accretion would
be needed to make up the difference, and, while he agreed that there was Anet deposition@ at the site, he disputed the amount
of deposition proposed by THI.[23]

(ii)        Testimony supports a finding that one
cannot assess the degree to which subsidence or erosion caused submergence.








Based on
our review of the record, we find the evidence is legally and factually
sufficient to support the court=s finding that one could not ascertain the extent of erosion
versus subsidence.[24]  THI would
have us hold that the finding is insufficiently supported by evidence because
no witness testified that Tract 1 had not subsided, and no witness testified,
based on any scientific analysis, that Tract 1 had subsided less than
approximately eight feet.  Further, THI points out that even Dr. Sherman
acknowledged that subsidence had occurred at the THI property, although he
could not say how much.  The Port=s surveyor, Foster, also acknowledged
that the area has been affected by subsidence.  However, though it may be
undisputed that subsidence has occurred, that fact does not render the court=s finding insufficient.  The finding
acknowledges Tract 1 has subsided, but finds that the extent to which
subsidence versus erosion contributed to the submergence cannot be determined.[25] 
Even THI=s experts acknowledged that
subsidence was not the only factor at work.  Dr. Dupre stated that Aby looking at the historical maps and
aerial photos, its clear that you can document evidence of subsidence, of
naturally occurring sediment deposition, naturally occurring bank erosion and
the presence of human-in-place dredged materials.  So all of these processes to
- - to one extent or another have been dominant.@  

Thus,
the trial court=s finding of fact is supported by legally and factually
sufficient evidence.  We overrule this issue.

3.       Other
Appellate Case Law Allowing Private Ownership of Land Under Tide Waters and
Rivers Either is of Dubious Value or Distinguishable.

We now turn to THI=s third claimed
exception to the general rule, that the state owns all land under tidewaters: appellate case law other than York. 
From our perspective, THI uses these cases to try to chip away at Luttes,
Rudder, and Lorino, but, as we explain below, these cases are
distinguishable and three of the four were handed down before the Luttes,
Rudder, and Lorino trilogy. 








THI
primarily relies on four cases other than YorkCDiversion Lake Club v. Heath, 126 Tex. 129, 86 S.W.2d 441 (1935),
Fitzgerald v. Boyles, 66 S.W.2d 347 (Tex. Civ. App.CGalveston 1931, writ dism=d), Fisher v. Barber, 21
S.W.2d 569 (Tex. Civ. App.CBeaumont 1929, no writ), and Port
Acres Sportsman=s Club v. Mann, 541 S.W.2d 847 (Tex. Civ. App.CBeaumont 1976, writ ref=d n.r.e.)Cto argue that Asubmergence does not necessarily
destroy the title of the owner.@  York, 532 S.W.2d at 954.[26] 
Heath involved land submerged by an artificial lake created after a dam
was constructed.  Heath, 86 S.W.2d at 442.  Fitzgerald and Fisher
involved land that either became submerged by tidal waters or became dry as a
result of the creation of a channel.  Fitzgerald, 66 S.W.2d at 348; Fisher,
21 S.W.2d at 569B70.  In each of these cases, the character of the property
was not changed as a result of the ordinary force of the water; there was no Atransportation of the land beyond the
owner=s boundary to effect that result.@  See York, 532 S.W.2d at 954
(citing 5A Thompson on Real Property ' 2562 (Grimes ed. 1957)).  In Mann,
the trial court analogized the submergence of marsh land by the continued use
of air boats through the marsh over a long period of time to the construction
of the dam in Heath, and reasoned that the landowner did not lose title
to submerged land although the landowner could not exclude others from fishing
in the waters above the property.  Mann, 541 S.W.2d at 849B50.

We do
not find these cases controlling here.  First, they are distinguishable.  None
of the cases involved erosion or other forces that we have in this case. 
Second, to the extent they arguably cast any doubt on the bright line rules
announced in Luttes, Rudder, and Lorino, we think it
significant that three of the cases were written before Luttes, Rudder,
and Lorino, and the fourth, without mentioning Luttes, Rudder,
and Lorino, relies on one of the earlier three to reach its result.  To
our reading, the trilogy of Luttes, Rudder, and Lorino
recognized and explained the bright line rules that have long dictated land
ownership.  And, the trilogy of York, Kenedy Memorial Foundation,
and Brainard reaffirmed the bright line rules.  As the Court recently
confirmed in Kenedy Memorial Foundation, Luttes is still the law:








The Court=s interpretation
of the civil law in Luttes is reasonable and workable, and it has
provided a rule for determining boundaries for more than forty years.  While we
recognize that the subject is not beyond reconsideration, stare decisis is
never stronger than in protecting land titles, as to which there is great
virtue in certainty.  We would be very reluctant to discard a rule determining
seashore boundaries that has served as long and satisfactorily as the rule in Luttes,
thereby upsetting long‑settled expectations, and we could not do so
absent far more compelling evidence than can be offered here.

Kenedy
Mem=l Found., 90 S.W.3d at 281 (citation omitted).  

As was
the case in Kenedy Memorial Foundation, Anothing in the record and argument
now before us convinces us that we should reconsider the rule determined in Luttes.@  See id.  For these reasons,
we choose not to follow whatever rule or exception is created by the four cases
THI cites.  Instead, we choose to follow the six Supreme Court cases that
announce and reaffirm the Luttes/Rudder bright line rule.

4.       The Trial
Court=s Judgment Does Not Violate the Takings
Clause

Next,
THI contends the trial court=s ruling constitutes a taking in violation of the Texas and
United States Constitutions.  See U.S.
Const. amend. V; Tex. Const.
art. I, ' 17.  Although we depend on the fact‑finder
to resolve disputed facts regarding the extent of governmental intrusion, the
ultimate issue of whether the facts constitute a taking is a question of law.  See
City of Austin v. Travis County Landfill Co., 73 S.W.3d 234, 240B41 (Tex. 2002).








THI
relies on York and Lucas v. South Carolina Coastal Council, 505
U.S. 1003 (1992), to argue that submergence by subsidence is not an inherent
hazard of owning Tract 1 and there is no exception to the takings clauses that
would permit the State to take THI=s land without just compensation. 
However, as we have held, Tract 1 was not affected by subsidence alone, and
this and the other factors discussed remove it from the rule applied in York. 
THI acknowledges that the possibilities of loss of land from processes such as
erosion are limitations on the ownership rights of the State and private
landowners along riparian or littoral boundaries.  See Brainard, 12
S.W.3d at 18 (AA riparian owner thus . . . loses title to portions of the land that are
worn, washed away, or encroached upon by the water.@); York, 532 S.W.2d at 952 (AThe general rule is that a riparian
or littoral owner acquires or loses title to the land gradually or
imperceptibly added or taken to or from his fast bank or shore.@).  The trial court likewise
recognized and applied these limitations, and its order does not effect an
unlawful confiscation of THI=s property.  Nothing in Lucas is inconsistent with
this result.  THI cites no Texas case involving riparian or littoral property
in which it was held that property lost as a result of natural occurrences or
even natural occurrences in conjunction with manmade causes violates the
takings clause, and we are not aware of any.  

C.      Any Pieces
of Disputed Property Above the High Tide Line Also Are Owned by the Port.

1.       THI=s Complaints.

THI=s next issue pertains to several
findings of fact and one conclusion of law.  The trial court found that the
entirety of Tract 1 became submerged at some time in the past and that the
portions of the tract that now lie above mean high water re-emerged as the
result of the deposit of dredge spoils by Kirby and its predecessor, Western
Towing, and concluded that the small portions of Tract 1 currently lying above
the water line resulted from Aself-help@ by THI or its predecessors, so that THI does not own these
small portions of land. 

The
contested findings of fact are as follows:

!                  
AOver a period of decades, the 27-Acre Tract became
submerged below the line of mean high tide.  This submergence occurred
gradually and imperceptibly and caused the historic meander boundary of the
27-Acre Tract to slowly contract and eventually to disappear.@

!                  
AThe only existing meander lines between land and water
that now exist at the location are the present meanders of Old River and the
San Jacinto River around an Island, part of which is claimed by THI to lie
within the 27 Acre Tract, and most of which is claimed by THI to lie within the
northerly part of the Island, called >Tract
2= by THI.@








!                  
ASmall portions of land above the line
of mean high tide within the area claimed by THI as the 27 Acre Tract arose
from submerged soil beneath the waters of Old River due to the deposit of
dredged spoil, sunken barges, and accretion caused by the sunken barges and
barge fleeting in and around The Big Empty.  These small portions of land would
not exist but for such activities, which were conducted by the lessees of the
Carter heirs, namely Western Towing and Kirby.@

2.       Some
Evidence Shows that Tract 1 was Permanently Submerged in the Past.

THI=s surveyor, Merten, identified three
areas within his survey of Tract 1 that lie above mean high water.  THI first
contends there is no evidence that the portions of Tract 1 above mean high
water ever were permanently submerged below mean high tide in the past.  THI
points to the testimony of its expert, Dr. Dupre, who testified that he saw no
evidence that Tract 1 ever became completely submerged except perhaps during
major storm events, and every aerial photograph he reviewed showed emergent
land.  In contrast, Dr. Sherman, the Port=s expert, testified that the
submerged areas of the site had been submerged Aat least since 1973,@ and that at some point, the entire
area became submerged.  Dr. Sherman explained that he reviewed a number of
sources to support his opinion, including aerial photography of the property,
maps produced by the Bureau of Economic Geology showing the site completely
inundated by storm surges from hurricanes Beulah and Carla, and another map
from the Bureau depicting submerged lands of the Texas coast that showed, based
on 1979 aerial photography, no island visible at all.  

THI
argues that Dr. Sherman=s opinions are suspect because he admitted he did not know
what the level of mean high tide was in photographs he reviewed, and he relied
on a map which THI contends was based on a photograph taken when the water
level was elevated.  However, these arguments ignore the totality of Dr.
Sherman=s testimony concerning the bases for
his opinions.  Concerning the map, Dr. Sherman explained that the high tide
readings THI complains of were only recorded from a remote, single tide gauge
in Trinity Bay, and there were no tide gauge readings directly applicable to
Tract 1 when the photograph was taken.  He also testified at length about the
reasons why he interpreted the map to show that Tract 1 was completely
submerged, including the absence of vegetation at the site, and he interpreted
the map=s data to mean that the entire area
was submerged. 

 








3.       Some
Evidence Proves that Portions of Tract 1 were Above Mean High Tide Because of
Self-Help.

THI next
challenges the evidence supporting the trial court=s findings that the small portions of
land above mean high tide were the product of dredging and other self-help
activities of the Carter Heirs= lessees, Western and Kirby.  Much of the testimony THI
relies on is from witnesses who did not see dredging occur, did not engage in
dredging, or had no knowledge of dredging.  For example, a witness for the Port
did not know of any dredging in the area, and a representative of the Carter
Heirs testified they did not dredge or deposit spoils on or near the tract. 
Earl Thrift, Jr., who lived just north of Tract 1 from 1979 through 1983 and
piloted tugboats in the area since 1983, testified he never observed dredging
along the tract.  

            THI
acknowledges that Patrick Smith, a Western Towing employee from 1989 through
1995, testified that Western Towing did some dredging on the Carter Heirs= property, but emphasizes that he
testified that the dredge spoil was to be dumped either in hopper barges or on
dry landCnot in the waters of Old River.  And,
after Smith left Western, he testified that he spent the next seven years,
until 2002, managing a business next door to Tract 1, and saw no dredging
adjacent to Tract 1 by Kirby or anyone else.  However, Smith admitted that he
did not know what dredging activities may have occurred in the area before
1989.  He also acknowledged that he did not actually watch the dredging
operations on a daily basis and agreed that it was possible that dredge spoil
could have been dumped elsewhere.  He also acknowledged that the bottoms of the
barges were largely rusted out, and dredge spoil could have leaked from them.








In
addition to the evidence that Western Towing conducted dredging operations at
the site, Dr. Sherman testified that the re-emergence of Aland@ at the site, which was completely
submerged, was caused by the placement of barges and the dumping of dredge
spoil.  Dr. Sherman also testified that the barges anchored at the site in the
1980s changed the flow pattern of the water around them, causing the deposit of
sediment in shoals forming behind them and preventing even greater erosion from
occurring.  Sherman testified that Aif the barges weren=t here anywhere, I don=t think there would be any land above
mean high water anywhere.@  He also explained, based on an aerial photograph, that
there was Aclear visual evidence that material has been deposited by human means. .
. . [A]nd in this circle that=s labeled as the thumb, there was also a dredge spoil
disposal.  And along the line between these circles called the islet and barge debris,
there was also a line of material deposited.@  Dr. Sherman concluded that, except
for human activity, Athis site would have been washed over routinely.@  Dr. Dupre, THI=s expert, also testified that he
identified evidence of dredge spoils in the three areas, including the area of
the Athumb.@  

We hold
that the evidence is both legally and factually sufficient to support the trial
court=s fact findings. 

4.       The Court
Correctly Concluded as a Matter Of Law that Portions of Tract 1 Were Above Mean
High Tide because of Self-Help.

Additionally,
we agree with the trial court=s conclusion of law concerning self-help. A private party may
not acquire title through self-help that raises land from submerged land lying
under tidal waters.  Brainard, 12 S.W.3d at 19 (AA widely recognized exception to the
general rule is that accretion does not belong to the owner of the land
adjoining the water when the owner causes the accretion.@); York, 532 S.W.2d at 952 (AA riparian or littoral owner may not
acquire title to submerged land through self‑help by filling and raising
the land level.@).  An island arising out of the bed of a navigable stream or
the submerged lands of a tidewater bay becomes the property of the State.  See
Giles v. Basore, 154 Tex. 366, 278 S.W.2d 830, 835 (1955); Lakefront
Trust, Inc. v. City of Port Arthur, 505 S.W.2d 606, 609 (Tex. App.CBeaumont 1974, writ ref=d n.r.e.).








THI
contends that if dredge spoils were placed elsewhere along Old River, but then
were washed onto Tracts 1 or 2 by the water, that would not constitute
self-help depriving THI of the upland acreage.  For this proposition, THI cites
Natland Corp. v. Baker=s Port, Inc., 865 S.W.2d 52 (Tex. App.CCorpus Christi 1993, writ denied). 
THI also contends Natland supports its claim that the actions of the
Carter Heir=s lessees should not be attributed to THI.  In that case, Natland=s predecessor granted the Corps of
Engineers a spoil disposal easement on which the Corps piled spoil from the
dredging of the intracoastal waterway.  The spoil was placed on dry land inland
from the shore.  Id. at 56.  Over time, by the action of rain, wind, and
gravity, some of the spoil gradually was washed from the piles toward the sea,
extending the land seaward.  Id. at 57.  The Natland court held
that the upland owner gained title to the land created by the gradual run-off
of that material.  Id. at 58.  The court also held that the owner=s granting of a dredging easement to
the Corps of Engineers Awas not sufficient participation by the owner to require
forfeiture of his right to the resulting accretions under the principles of Lorino.@  Id.  

However,
we have already determined that legally and factually sufficient evidence
supports the trial court=s findings, disputing THI=s claim that the emergent areas were
the product of accretions onto dry land.  We also find Natland
distinguishable on the issue of self-help, because the grant of an easement to
a government authority to dump dredge spoil from a project unrelated to the
owner=s property is not the equivalent of a
lease to private entities to conduct barge fleeting and related dredging
operations at the site.  

We
therefore overrule this issue.  Having overruled each of THI=s issues related to ownership of
Tract 1, this concludes our discussion of that issue and we turn to the second
broad issue in the case, the southern boundary of Tract 1. 

II.       Part 2:
The Surveying Issues








We now
consider the second part of THI=s appeal, which concerns the location of the southern
boundary of the J.T. Harrell survey.  As the trial court found, Tract 1 is
bounded by  (1) the Jones-Hare line to the east (a vertical, north-south line),
(2) the south line of the J.T. Harrell survey to the south (a horizontal,
east-west line), and the meanders of Old River to the north and west.  The
location of the Jones-Hare line is undisputed.  And, we have already determined
that the 1838 meanders of the Old River cannot be located today.  Therefore,
the only remaining boundary issue is the location of the south line of the J.T.
Harrell survey.[27] 

This
issue was hotly contested by the parties, because THI=s placement of the lineCseveral hundred feet further south
than the Port and Kirby locate itCgives THI more land in Tract 1 and
could establish that Tracts 1 and 2 are contiguous.  As discussed in greater
detail in Part 3 of this opinion, the placement of the south line is central to
THI=s claim that it owns Tract 2.

THI
raises five issues challenging the trial court=s fact findings and conclusions of
law, which adopt Foster=s survey of the south line of the J.T. Harrell survey as the
correct one and find Merten=s survey incorrect and unreliable.  In issues seven through
nine, THI attacks Finding of Fact No. 20, set out below:

The J.T. Harrell line is correctly located by the
survey of Nedra Foster (Kirby Exhibit 2), which is incorporated herein as if
set out verbatim.  This is the same line as that found by the surveys of J.S.
Boyles that were patented by the Texas General Land Office in 1936 and 1953. 

THI contends (1) the
trial court erred by concluding that the southern boundary of Tract 1 is
correctly located by Foster, (2) if Finding No. 20 is correctly a fact finding,
there is no evidence, or alternatively, insufficient evidence to support it,
and (3) the trial court committed harmful error by excluding evidence
demonstrating errors in Boyles=s surveys on which Foster relied. 








In its
tenth issue, THI challenges the trial court=s finding that Merten=s survey was incorrect and
unreliable, and in its eleventh issue, THI contends there is no evidence, or
alternatively, insufficient evidence to support the finding that the riparian
boundaries of Tract 1 cannot be surveyed.[28]


A.      The Facts
Relating to the Relevant Historical Surveys.

In 1838,
H. Trott surveyed a tract of public land conveyed by the Republic of Texas to
J.T. Harrell.  In 1845, Trott=s survey was patented by the General Land Office (AGLO@).  The description of the J.T.
Harrell survey was as follows:

. . . beginning at the mouth of Bear Bayou, at the
point, Thence south 622 degrees west, 4300 varas to a stake and mound in the prairie
the same being Carpenter & Harris corner as corrected by order of the
commissioner general.  Thence east 5820 varas with this line to the San Jacinto
River, Thence up the west bank of same as it meanders to the beginning . . . .[29]

Trott=s survey, being the oldest survey of
this property, is considered the senior survey of the J.T. Harrell grant; later
surveys are considered junior to it.  The property we know as Tract 1 was part
of the J.T. Harrell grant.

In 1895,
Tract 1 was severed from the larger tract and sold separately.  Tract 1 was first
described in the deed of May 27, 1895, from Mary Jones to J.P. McGee, and then
described in the deed of February 15, 1896, from J.P. McGee to Emma Hudson.  The Magee/Hudson deed of 1896
described the south boundary of Tract 1 as commencing at the Jones-Hare line
(the north-south line forming the eastern boundary), A[t]hence west 1636' feet along the
common line of the Harris and Carpenter league and the JT Harrell.@  Thus, the south line of the J.T.
Harrell survey forms the south boundary of Tract 1.








Our
record does not reflect another survey of this area until 1936, when J.S.
Boyles, then the Harris County Land Surveyor, surveyed purported vacancies
existing in areas west of Old River and south of the J.T. Harrell survey.  To
determine the extent of the vacant land, Boyles was required to fix the
surrounding survey lines, including the south line of the J.T. Harrell survey. 
Boyles found the south line on the ground, reporting to the GLO that 

The J.T. Harrell can be located with
a fair degree of accuracy, giving due recognition to [its] beginning call at
the mouth of Bear Bayou.  [Its] north line, while substantially 2 degrees off
of [its] called course, is well marked and recognized on the ground.  The
South line of the same is also well recognized and marked on the ground.  By
taking the intersection of the two marked lines of the Harrell at their Western
terminus, we find that this point is 1694.2 varas North of the Northeast corner
of the Vince Survey and further that Trott in 1838 made this distance, in his
survey of the Peter J. Duncan, 1700 varas, which is a very close check after a
hundred years.

(emphasis added).  Thus,
Boyles was able to locate Trott=s markings on the ground for the South line of the J.T.
Harrell survey.  Based upon Boyles=s survey, a patent was issued for the
W.T. Carter survey, located directly below the south line of the J.T. Harrell
grant, and for the W.M. Buehler and B.N. Garrett surveys.  The Buehler and
Garrett surveys were immediately below the Carter survey and had as their
western borders a continuation of the western border of the Carter survey.[30]








In 1951,
Boyles surveyed the unappropriated areas east of Old River, and based upon his
survey, the State issued a patent to Mary Niedermeier for a 730.6-acre tract
abutting and immediately south of the J.T. Harrell survey.  The northern
boundary of the Niedermeier survey is the J.T. Harrell south line.[31]
 Thus, both the Carter and Neidermeier surveys share the south line of the J.T.
Harrell survey as their northern boundary, the Carter survey to the west and
the Neidermeier survey to the east.  

B.      The
Competing Surveys of the South Line by Merten and Foster. 

The
placement of the south line was disputed primarily because Trott=s 1838 description did not include
any calls to natural monuments or other objects that could be used today to
locate the south line on the ground, and the description merely provided that
from the southwest corner the line proceeded A[t]hence east 5820 varas . . . to the
San Jacinto River.@ 

1.       Merten=s Method of
Locating the Line.

THI=s surveyor, Merten, testified that,
to locate the south line, he first sought to determine the location of the
southwest corner of the J.T. Harrell survey.  To do this, he found the north
line of the Vince survey (which is south and west of the H.T. Harrell survey), Aturned a record angle@ based on Trott=s field notes, and projected a line
1700 varas north.  Merten then sought to trace the east line of the adjacent
Duncan survey, which bounds the J.T. Harrell survey on the west, to find a
common point.[32]  From his
southwest corner, Merten then Aturned 90 degrees@ and projected the J.T. Harrell south
line Adue east,@ based on Trott=s Athence east@ course call. 

Merten also
testified that he checked his work by determining that the relationship between
the angle of the north line of the J.T. Harrell survey and the south line as he
placed it was 272 degrees, which corresponded with Trott=s call for the line (coming from the
opposite direction) from Bear Bayou to the southwest corner to be on the course
of Asouth 622 degrees west.@  By comparison, Merten explained
that the angle between Foster=s placement of the north and south lines was 25 degrees, as
opposed to Trott=s 272 degrees, and her south line did not run due east.  








Merten
testified that using record angles was an appropriate method to use to
reconstruct a survey when there are no marks on the ground or possession lines
that can be connected to the senior survey.[33] 
Merten acknowledged, however, that from where he placed the southwest corner of
the J.T. Harrell survey, his north-south survey line would not correspond with
the existing west line of the Carter, Buehler, and Garrett surveys. 

2.       Foster=s Method of
Locating the Line.

Foster
testified on behalf of the Port and Kirby concerning her placement of the J.T.
Harrell south line.  Foster explained that she set out to find Trott=s footsteps on the ground to
reestablish his line.  Foster testified that she began her survey by locating
the calls to the natural objects identified in Trott=s 1838 survey, such as the mouth of
Bear Bayou and the San Jacinto River.  She explained that, because other marks
Trott made were gone, she also looked at Boyles=s surveys and field notes, and
explained that Boyles Ahad of necessity found the established lines of the senior
surveys.  And so we also looked at his work where he had found Mr. Trott.  The
perpetuation of that survey.@  

She
located the southwest corner by locating Boyles=s marks on the ground:  AWhen Boyles ran the lines and found
the marks left on the ground, he said that he ran it to an intersection out to
the west, and he said that it was 7.4 varas south of the intersection of the
railroad and Sheldon Road.@  Foster testified she located this exact point.  Foster then
located Boyles=s calls for objects along the south line, fixing her south line at the
same location as Boyles.  Foster further testified that although the junior
surveys agreed with Trott=s senior survey, she was not using the junior surveys to find
the J.T. Harrell south line; she was using Trott=s survey of the J.T. Harrell grant.  








Foster
also testified that she had worked in the area previously, and in 1988 had
located the north and south lines of the J.T. Harrell survey in the course of
her work.  In conducting the survey for this litigation, she checked her
earlier work to confirm she had done it correctly.  Foster testified she found
the south line in the same location where she had located it in 1988.

Foster
criticized Merten=s reliance on Aturning angles@ as inappropriate for use in
retracing a survey=s boundaries.  She acknowledged that the bearings on her
survey were not exactly 622 degrees, but stated that bearings were just a guide and were
not controlling; rather, what controlled was Athe marked line on the ground.@  Foster also testified that her
survey located the south line in the same place as Trott=s 1838 survey and Boyles=s 1936 and 1951 surveys, and her
placement of the south line created no conflicts with the adjacent surveys in
the area.  

As
placed, Foster=s line was approximately 325B400 feet further north than Merten=s line.

C.      The Law
Controlling Surveys and Surveyors.

THI contends
the issue of which surveyor correctly surveyed the line is a matter of law.  It
claims that Trott=s survey of 1838 is the senior survey and must control the
location of the south line.  According to THI, Merten followed well-established
law by using Trott=s survey to draw the south line due east from the southwest
corner of the J.T. Harrell grant.  THI contends Foster disregarded Trott=s survey and improperly relied on
junior surveys to mark Trott=s senior survey.  Alternatively, THI argues that if the issue
is not a matter of law but a fact issue, then (a) there is no evidence or
legally insufficient evidence to support the trial court=s fact finding that Foster correctly
surveyed the southern boundary of Tract 1, and (b) the trial court abused its
discretion by not permitting THI to introduce evidence that would demonstrate
that Boyles erred in drawing his lines.  

 








1.       The
Location of the J.T. Harrell South Line is a Question of Fact.

We first
address THI=s argument that the correctness of the surveyors= work is a matter of law.  Texas law
is well settled that unless the facts are undisputed, the location of a survey
line, as it was run on the ground by the original surveyor, is a question of
fact for the jury.  See East Tex. Pulp & Paper Co. v. Cox, 381
S.W.2d 78, 83B85 (Tex. Civ. App.CBeaumont 1964, writ ref=d n.r.e); Angelina County Lumber
Co. v. McKnight, 265 S.W.2d 246, 249B50 (Tex. Civ. App.CWaco 1954, writ ref=d n.r.e.).  The Texas Supreme Court
has explained that A[a]s to what are boundaries, is a question of law for the
determination of the court; as to where the boundaries are upon the ground, is
a question of fact to be determined from the evidence.@  Farley v. Deslonde, 58 Tex.
588, 591 (1883).  

THI
cites Brainard v. State, 12 S.W.3d at 26, for the proposition that the
choice between legally correct and incorrect surveys is a question of law.  We
conclude Brainard does not control here.  In Brainard, the
question was the location of the boundary dividing private property from state
property.  The boundary was in dispute not because of competing surveys, as
here, but because the width of the river had narrowed significantly from 3400
feet to 20B50 feet.  Id. at 12.  The Court had to decide whether the boundary
should be based on the present-day riverbed, as advocated by the landowners, or
the Anatural@ riverbed as it existed before the
dam was closed.  Id. at 10B11.  The Court held as a matter of
law that the boundary line was the present-day riverbed, not the so-called Anatural@ riverbed, because the State owns the
riverbed, and held that the State=s survey of the Anatural@ riverbed did not reveal the true
property line.  Id. at 10, 26.  Thus, the State=s survey was immaterial, and did not
raise a fact issue, because it was not a survey of the boundary line.

In
contrast, everyone agrees that the J.T. Harrell survey line is the property
line of Tract 1.  The only question is which of the competing surveys
accurately shows the location of the line as found by H. Trott in 1838.  This
question is a question of fact.  See Farley v. Deslonde, 58 Tex.
at 591.  We therefore briefly review the applicable law and turn to THI=s legal and factual sufficiency
arguments.








2.       The Law
Governing How to Find the Original Surveyor=s Footsteps.

When
finding the lines of a survey, A[t]he cardinal rule is that the footsteps of the original
surveyor, if they can be ascertained, should be followed.@  Hurr v. Hildebrand, 388
S.W.2d 284, 288 (Tex. Civ. App.CHouston 1965, writ ref=d n.r.e.); see also Humble Oil
& Ref. Co. v. State, 162 S.W.2d 119, 132 (Tex. Civ. App.CAustin 1942, writ ref=d) (AThe primary objective in locating a
survey is to >follow the footsteps of the surveyor=; by which is meant to trace on the
ground the lines as he actually ran them in making the survey.@).  If the actual lines and corners
run by the original surveyor can be found, they are controlling, even if they
are inconsistent with the calls and references in that surveyor=s field notes.  See Wheeler
v. Stanolind Oil & Gas Co., 151 Tex. 418, 252 S.W.2d 149, 151 (1952)
(stating that the footsteps of the original surveyor are controlling and
prevail over calls for course and distance); Thatcher v. Matthews, 101
Tex. 122, 105 S.W. 317, 318 (1907), (stating that when the actual lines run by
the surveyor can be found, they constitute the true boundary and cannot be made
to yield to course and distance calls); Teal v. Powell Lumber Co., 262
S.W.2d 223, 226B27 (Tex. Civ. App.CBeaumont 1953, no writ) (stating that
Aif the footsteps of the original
surveyor can be identified and followed, they will control the location of the
line or boundary in question even though they may not be in harmony with the
field note calls@).

When one
can locate on the ground with certainty and without inconsistency the objects
or monuments designated by the original surveyor Aas marking the lines he actually
traced . . . , the survey must be laid out from those points, and extraneous
evidence cannot be admitted to contradict the assertion of the surveyor that he
actually went to the points he so designated.@  Humble Oil, 162 S.W.2d at
132B33.  However, if the location of the
actual footsteps of the surveyor cannot be established with reasonable
certainty, Aall the surrounding facts and circumstances should be considered in order
to arrive at the purpose and intent of the surveyor who made the original
survey.@  Hurr, 388 S.W.2d at 288.








Thus,
although the original surveyor=s marks and calls are generally controlling, when the
surveyor=s marks have disappeared over time,
the lines and corners of the survey may be established using any evidence
tending to show their location that is Athe best evidence of which the case
is susceptible.@  See, e.g., City of Carrollton v. Duncan, 742 S.W.2d
70, 72, 76B77 (Tex. App.CFort Worth 1987, no writ); Angelina County Lumber Co. v.
McKnight, 275 S.W.2d 246, 249B50 (Tex. Civ. App.CWaco 1954, writ ref=d n.r.e.); Taylor v. Higgins Oil
& Fuel Co., 2 S.W.2d 288, 300 (Tex. Civ. App.CBeaumont 1928, writ dism=d w.o.j.).  Courts generally consider
the Abest evidence@ to be Athat evidence which is the more
specific and definite as against that which is merely general and indefinite or
descriptive.@  Taylor, 2 S.W.2d at 300.

D.      The Trial
Court=s Decision to Adopt Foster=s South Line is
Supported by the Evidence.

1.       Although
Foster Used Boyles=s Junior Survey, She Did Not
Improperly Rely on It.

THI
contends Foster improperly relied on Boyles=s junior surveys to mark Trott=s senior survey.  THI cites Strayhorn
v. Jones, 300 S.W.2d 623, 630 (Tex. 1957), for the proposition that
the description in the senior survey controls when locating a line of that
survey over any junior survey of that line, unless the evidence proves that the
senior survey is in error.  








Because
there is no evidence that Trott made an error in describing the Harrell line,
THI contends, Merten correctly performed his survey by relying on Trott=s Athence east@ course call.  However, courts have
held that, when the original surveyor=s marks can no longer be found, the
calls and recitals in a junior survey may be the best evidence of the original
boundaries of the senior survey.  Dixon v. Dewhurst, 169 S.W.3d 515, 518B19 (Tex. App.CTexarkana 2005, no pet.); Hill v.
Whiteside, 749 S.W.2d 144, 152 (Tex. App.CFort Worth 1988, writ denied) (per
curiam); Barnes v. Wingate, 342 S.W.2d 352, 357 (Tex. Civ. App.CBeaumont 1960, writ dism=d).  Further, when a subsequent
surveyor is shown to have found the natural and artificial objects called for
in a senior survey, and to have re-marked those lines and corners in the same
location, that subsequent survey will assume the dignity of the original.  Humble
Oil, 162 S.W.2d at 133; Taylor, 2 S.W.2d at 301.  So, although a
junior survey cannot be used to create an ambiguity in or to change the lines
of a senior survey, Kirby Lumber Corp. v. Lindsey, 455 S.W.2d 733, 739
(Tex. 1970), it may be used as evidence of the location of the lines of a
senior survey.  Dixon, 169 S.W.3d at 518B19; Hill, 749 S.W.2d at 152.  

Foster
testified that she sought to find Trott=s footsteps on the ground.  One of
the ways she did that was to find the perpetuation of Trott=s survey by looking to county
surveyor Boyles=s patented surveys, which in turn were based on Trott=s survey, to locate the south line of
the J.T. Harrell grant.  Foster found that, in 1936 and again in 1951, Boyles
surveyed the south line of the J.T. Harrell survey as part of his survey of
untitled vacancies immediately to the south of that line.  Boyles reported at
the time that the line was Awell marked and recognized on the ground,@ and filed detailed survey and field
notes with the GLO that were the basis for the Carter, Buehler, Garrett, and
Neidermeier patents.  Boyles=s surveys of the vacancies expressly called for a common line
with the J.T. Harrell Survey, and detailed physical objects and markings along
that line.  Using Boyles=s surveys and field notes, Foster retraced the south line of
the J.T. Harrell survey, just as she had done in 1988 in a survey not prepared
for litigation.  Foster did not improperly rely on Boyles=s junior survey.

2.       Boyles
Located Trott=s Marks for the South Line of the
J.T. Harrell Grant.








THI also
complains that Foster wrongly assumed Boyles necessarily established the lines
of Trott=s senior survey when surveying the
boundaries of other tracts.  THI notes that in Boyles=s 1936 survey, he reported that the
south line of the J.T Harrell was Awell marked and recognized on the
ground,@ but asserts that there is nothing to
connect any marks that Boyles may have found to Trott=s survey, and that, after the passage
of 98 years between Trott=s 1838 survey and Boyles=s 1936 survey, there can be no
presumption that any marks left were Trott=s work.[34]


However,
Boyles stated that he was able to find Trott=s line, and Foster found where Boyles
perpetuated that line.  Surveyors are presumed to have performed their official
duties and to have actually surveyed and marked all the lines to the corners.  See
State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228, 232 (1936) (stating that a
surveyor is presumed to have done his official duties); East Tex. Pulp &
Paper Co., 381 S.W.2d at 84 (stating that absent proof to the contrary, it
is presumed the original surveyor performed his duties, including marking the
lines).  This is particularly true after their work has been accepted by the
GLO.  See State v. Sun Oil Co., 114 S.W.2d 936, 945B46 (Tex. Civ. App.CAustin 1938, writ ref=d) (stating that after an extended
lapse of time, and issuance of a patent, the county surveyor should be presumed
to have properly discharged his official duties).  No evidence indicates the
line Boyles found was not Trott=s line.  Additionally, the GLO accepted Boyles=s survey and field notes, and the
State of Texas issued patents based on those surveys and field notes.

 

 








3.       The Trial
Court Did Not Abuse Its Discretion by Excluding Boyles=s 1951 Field Book
and the Testimony of Bouse.

THI also
contends the trial court erred in excluding Boyles=s 1951 field book and the testimony
and exhibits of surveyor Bouse, which THI contends demonstrated errors in
Boyles=s survey.  We review the trial court=s exclusion of evidence for abuse of
discretion.  City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex
1995).  Boyles=s field book, which was not patentedCunlike Boyles=s survey and field notesCwas properly excluded because the
patented survey and field notes control over unpatented field books.  See
Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W.2d 801, 808
(1937).  Excluding Bouse=s testimony and exhibits also was proper because the trial
court was enforcing a pre-trial order (sought by THI) limiting each party to
one surveying expert, and THI chose Merten over Bouse.  Even if the trial court
had abused its discretion, however, THI makes no effort to argue or demonstrate
that any error was reasonably calculated and probably did result in an improper
judgment.  See Tex. R. App. P. 44.1(a).


4.       Merten=s Reliance on
Certain Calls in Trott=s Survey Was Not
the Only Correct Way to Locate the South Line Line of the J.T. Harrell Survey.








We turn
next to THI=s claim that Merten=s reliance on Trott=s Athence east@ course call was the only correct
manner of surveying the south line of the J.T. Harrell survey, and that Foster
improperly disregarded Trott=s course call.  As support for this proposition, THI cites
the following statement from Kirby Lumber Co. v. Adams, 127 Tex. 376, 93
S.W.2d 382, 385 (1936):  A[W]here the natural and artificial objects of the grant cannot
be identified upon the ground, the proper method of locating the lines and
corners will be by course and distance from the nearest recognized and
established corner or artificial object with which the field-notes are
connected.@  THI also cites the order of preference courts give to the dignity of
surveyors= calls:  (1) natural objects; (2) artificial objects; (3) course; and (4)
distance.  See Mohnke v. Greenwood, 915 S.W.2d 585, 591 (Tex. App.CHouston [14th Dist.] 1996, no writ). 
Because no marks or monuments can now be found along the south line, THI
argues, Trott=s unambiguous course call must control.  

The rule
THI relies on, however, does not control when other evidence is available from
which the actual location of the survey line can be established.  See Wheeler,
252 S.W.2d at 151; Thatcher, 105 S.W. at 318; Teal, 262 S.W.2d at
226B27.  Here, Foster found and followed
Trott=s footsteps.  Foster placed the south
line at the same location that Boyles found Trott=s original marked line, and there are
no overlaps or conflicts among these surveys.  

In
addition, Merten acknowledged that Foster=s placement of Trott=s south line matches Boyles=s 1936 and 1951 locations of that
line, and matches the location of the Carter, Buehler, and Garrett surveys. 
Long-recognized and established boundaries will be disturbed only upon the most
cogent and compelling evidence.  See Strong v. Delhi-Taylor Oil Corp.,
405 S.W.2d 351, 375B76 (Tex. Civ. App.CAustin 1930, writ ref=d n.r.e.) (citing Blaffer v. State,
31 S.W.2d 172, 191 (Tex. Civ. App.CAustin 1930, writ ref=d)); see also Kenedy Mem=l Found., 90 S.W.3d at 281 (A[S]tare decisis is never stronger than in protecting
land titles, as to which there is great virtue in certainty.@). 

Merten,
in contrast, disregarded Trott=s physical call to the mouth of Bear BayouCan existing natural object named in
Trott=s surveyCas the starting point, and instead
found a point he believed to be the southwest corner of the J.T. Harrell survey
and drew a Adue east@ line across the area.  Merten acknowledged that a surveyor goes out in
the field to find the lines as they were marked on the ground, and agreed that
one way to find the original surveyor=s marks in the field is to see how
those marks have been perpetuated over time.  But, Merten did not traverse all
of the survey lines he placed to look for marks.  Instead, he merely turned an
angle and looked at bearings.  








Both
Merten and Foster agreed that the course calls in a survey can vary from one
surveyor to the next.  Foster testified that bearings are just a guide, and
even Merten acknowledged that it is Avery common for two different
surveyors to be surveying the same line and have a call for a different
bearing.@  Bearings and course calls should
not be used to establish the location of a survey line if there is other
reliable evidence showing where it was actually run on the ground.  See
Wheeler, 252 S.W.2d at 151 (footsteps of original surveyor control over
calls for course and distance); Thatcher, 105 S.W. at 318 (where actual
lines run can be found, they constitute the true boundary and cannot be made to
yield to course and distance calls). 

Based on
the foregoing, we hold that the hotly contested issue of the location on the
ground of the south line of the J.T. Harrell survey was a fact issue for the
trial court to determine.  We further hold that the evidence is legally and
factually sufficient to support the trial court=s Finding No. 20, and its finding
that Merten=s location of the south line of the J.T. Harrell survey was incorrect. 
We also hold THI has not demonstrated the trial court reversibly erred in
excluding its proffered evidence.

We
therefore overrule THI=s issues seven through eleven.

III.      Part 3:
The Summary Judgments on Tract 2.

In the third part of its brief, THI raises three issues all
related to the ownership of Tract 2:  In its twelfth issue, it contends the
trial court erred when it granted the Port=s motions for
summary judgment and Kirby=s motion for summary judgment in part,
determining that THI did not own Tract 2.  In its thirteenth issue, THI
contends the trial court also erred by not granting its motion for partial
summary judgment on its claimed ownership of Tract 2.  Finally, in its fourteenth
issue, THI contends the trial court erred when it refused to admit evidence
from a newly designated photogrammetry expert, Wayne Grip.  








THI=s only claim of ownership on appeal
depends for its success on Tracts 1 and 2 being contiguous.  As we explain
below, Kirby and the Port moved for summary judgment, in part, arguing just the
oppositeCthat Tracts 1 and
2 are not contiguous.  Thus, they argued, if the strip-and-gore doctrine were
to apply, it could not apply in THI=s favor.  We hold
that Tracts 1 and 2 are not contiguous and therefore Tract 2 could not have
passed as a strip or gore with Tract 1.  Because we agree with Kirby and the
Port that the strip-and-gore doctrine, if applicable, does not apply in THI=s favor, we hold
that the trial court properly granted Kirby and the Port=s motions for
summary judgment, and also properly denied THI=s motion.  We also
determine that excluding Grip=s affidavit was not an abuse of
discretion.

A.      Procedural
History and Background.

All three parties filed motions for summary judgment.  THI
and Kirby both claimed to own of Tract 2.  Kirby also pleaded in the
alternative simply that THI did not own Tract 2.  The Port moved for summary
judgment claiming only that neither THI nor Kirby owned Tract 2.  Ultimately,
the trial court concluded THI did not own Tract 2, though it did not determine
who owned the tract.  The trial court did not identify any particular basis for
its ruling.[35] 


Kirby and the Port advanced four bases upon which summary
judgment could be granted in their favor: (1) the 1896 deed from Hudson to
Magee did not effectively reserve Tract 2 for Hudson=s estate; (2) the
strip-and-gore doctrine does not apply; (3) if the strip-and-gore doctrine
applies, it does not apply in THI=s favor; and (4)
Tract 2 never truly existed, but was instead located south of the J.T. Harrell
line and thus already owned by the Port.  These are the four possible bases to
support the trial court=s grant of summary judgment in appellees= favor.  We hold
that the third basis is adequate to support the trial court=s ruling.

THI advanced several theories for why it owned Tract 2 and
thus should receive summary judgment in its favor.  These included the
following: its predecessors in interest acquired title by adverse possession,
the Carter heirs quitclaimed the property to THI, the land was passed under a
theory of Amore or less@ language included
in the 1905 deed, and the land was a strip or gore that passed with the 1905
deed.  








The Port and Kirby claim that THI has not addressed all
possible bases upon which we could affirm summary judgment, and thus we must
affirm due to waiver.  See Malooly Bros., Inc. v. Napier, 461 S.W.2d
119, 121 (Tex. 1970); see also F.M. Props. Operating Co. v. City of
Austin, 22 S.W.3d 868, 872 (Tex. 2000) (stating that when a trial court
does not specify the grounds on which summary judgment was based, we must
affirm if any of the grounds raised was meritorious).  We have carefully
reviewed the record and briefing to this court, and we disagree that the issue
is waived.  THI has attacked all possible bases Kirby and the Port presented
upon which we could affirm, and has also presented its own theory upon which it
believes we could render summary judgment in its favor or remand for a trialCthe strip-and-gore
doctrine.[36] 


To reverse the trial court=s ruling and hold
that THI should have received summary judgment in its favor, we must determine
that THI=s proffered basis
of the strip-and-gore doctrine supports its argument that it should have
received summary judgment in its favor.  However, if Kirby and the Port are
correct that the strip-and-gore doctrine cannot apply in THI=s favor, then we
must affirm the trial court=s grant of summary judgment in Kirby and
the Port=s favor, and its
denial of summary judgment in THI=s favor.  We
disagree with THI that the strip-and-gore doctrine would apply to grant it
ownership to Tract 2 because the tracts are not contiguous; therefore, we
affirm summary judgment.

B.      Standard
of Review.








We review the trial court=s summary judgment
ruling de novo.  Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661
(Tex. 2005).  In our review, we take as true all evidence favorable to the
nonmovant, and indulge every reasonable inference and resolve any doubts in the
nonmovant=s favor.  Id.  When the parties moved for
summary judgment on the same issues, as they did in this case, we consider the
summary judgment evidence presented by all sides, determine all questions
presented, and, if the trial court erred, render the decision the trial court
should have rendered.  See id.  We hold that the trial court did not
err.

C.      The 1896
and 1905 Deeds.

Kirby and the Port argue that Tract 2 passed from Hudson to
Magee in 1896.  At that time, Hudson, a minor, owned a significant amount of
land including: Tract 1; a 107 acre parcel of land north of the J.T. Harrell
line that included the 6.1 acres comprising Tract 2; and 800 acres located
south of the J.T. Harrell line and which is contiguous with Tract 2.  Hudson=s guardian,
Farmer, executed a deed selling Aall that tract or
parcel of land containing 100 9/10 acres out of the north part of 107 . . . .@  The deed also
contains a metes and bounds description of the land conveyed.  Then, in 1905,
Farmer executed another deed conveying to Donaldson and Hart Tract 1 and 800
acres south of the J.T. Harrell line.  Although no other deeds are recorded
transferring Hudson=s land between 1896 and 1906, Farmer=s inventory of
Hudson=s estate filed in
1907 did not list the 6.1 acres of Tract 2 as realty Hudson owned.  Thus,
question the parties attempted to answer below was: what happened to Tract 2?

Kirby and the Port contend Tract 2 passed by the 1896 deed
because that deed was ineffective to reserve any portion of the 107 acres.  THI
counters that the 1896 deed was effective to reserve 6.1 acresCTract 2Cand that the land
passed as a strip or gore with the 1905 conveyance to Donaldson and Hart.  

THI cannot maintain its claim of ownership under the
strip-and-gore doctrine without first proving that the 6.1 acres were
effectively reserved.  However, we need not determine whether or not the
reservation was effective because we hold that, even if it was effectively
reserved, THI could not own the property under the strip-and-gore doctrine. 
Therefore, for purposes of our analysis, we will assume arguendo that
the 1896 deed was an effective reservation 6.1 acres.

 








D.      The Strip-and-Gore
Doctrine Does Not Apply to Tracts 1 and 2.

The strip-and-gore doctrine is intended to avoid litigation
by presuming that Aa grantor has no intention of reserving a
fee in a narrow strip of land adjoining the land conveyed when it ceases
to be of use to him, unless such fee is clearly reserved.@  Cantley v.
Gulf Prod. Co., 135 Tex. 339, 143 S.W.2d 912, 915 (1940) (emphasis added). 
The doctrine applies only Ato relatively narrow strips of land, small
in size and value in comparison to the adjoining tract conveyed by the
grantor.@  Angelo v.
Biscamp, 441 S.W.2d 524, 526B27 (Tex. 1969)
(emphasis added).  Therefore, if the land conveyed does not adjoin the strip or
gore, the doctrine does not apply.  

Here, the trial court=s placement of the
J.T. Harrell south line precludes any application of the strip-and-gore
doctrine.  As the exhibits attached to the findings of fact and conclusions of
law show, Tracts 1 and 2 are not contiguous.  In addition, no party argues that
Tracts 1 and 2 were ever contiguous in 1896 or 1905 at the J.T. Harrell south
line, and THI has not pointed us to a place in the record containing proof of
contiguousness in 1896 or 1905.[37] 
Tract 2 is contiguous with the land to its north, and the 800 acres to its
south, which the Port owns.  As a result, if it is a strip or gore, it must
pass with the land adjoining it, which Tract 1 does not.  

THI has not argued on appeal any other legal basis on which
it should receive summary judgment.  Having determined that Tracts 1 and 2 are
not contiguous as required by the strip-and-gore doctrine, we hold that the
trial court properly granted summary judgment in Kirby and the Port=s favor, and
correctly denied THI=s motion.

E.      The Grip
Affidavit.








The trial court placed the J.T. Harrell south line during
the first part of the bifurcated trial.  That line, as is shown clearly in the
exhibits attached to the findings of fact and conclusions of law, shows the
south line=s location and also shows that Tracts 1 and 2 are not
contiguous, adjoining tracts.  

During the summary judgment phase, THI claimed that the
appellees had introduced a Avoodoo@ exhibit, which
moved the south line by several hundred feet to the north.  To prove their
point, they attempted to introduce expert evidence via a photogrammetry expert,
Wayne Grip, who would have placed the south line in a different location. 
However, Grip=s affidavit would have served only as an attempt to
relitigate the location of the J.T. Harrell grant south line.  The trial court
had already heard extensive expert testimony regarding the location of the
south line.  It made a finding on that issue and incorporated exhibits
depicting where the line lay on the ground.  As a result, Grip=s affidavitCwhich served only
to refute the placement of that lineCwas unnecessary
and it was within the trial court=s discretion to
exclude it.  See Vela v. Wagner & Brown, Ltd., 203 S.W.3d 37, 52
(Tex. App.CSan Antonio 2006, no pet.) (we review a trial court=s decision to
admit or exclude expert evidence under and abuse of discretion standard).  We
overrule appellant=s summary judgment issues.

IV.      Conclusion

We
overrule THI=s issues and affirm the trial court=s judgment.

 

 

 

 

/s/        Wanda McKee Fowler

Justice

 

 

 

Judgment rendered and Corrected
Opinion filed February 1, 2007.

Panel consists of Justices Hudson,
Fowler, and Seymore.

 









[1]  We correct the opinion to clarify our description of
the trial court=s disposition of Kirby=s motion for summary judgment in footnote 35.





[2]  The trial court=s
Finding of Fact No. 3, which is unchallenged, specifically states that Tract 1 Alies in Harris County, east of the City of Houston,
north of the confluence of the Houston Ship Channel and the San Jacinto River,
south of Interstate 10, and in the area of confluence of the San Jacinto River
(to the east and south of the property) and Old River (to the north and west of
the property).@





[3]  Since 1978, Kirby, or its predecessor, Western
Towing Co., had leased Tract 1 from the Carter Heirs to conduct its barge
mooring and fleeting business adjacent to the property.  From 1978 until 1991,
the Carter Heirs charged $500 a month for the lease, and in 1991 increased it
to $1,000 a month. 





[4]  The trial court granted a temporary restraining
order prohibiting THI from interfering with Kirby=s use and possession, and the parties later agreed to a temporary
injunction pending trial.





[5]  Kirby joined both the Port and the General Land
Office of the State of Texas (AGLO@).  However, the trial court later granted the GLO=s plea to the jurisdiction and motion to dismiss, in
which it argued in part that the State had no interest in the property at issue
because the property was conveyed to the Port by statute.





[6]  The term Ariparian@ means Abelonging
or relating to the bank of a river or stream.@  Brainard v. State, 12 S.W.3d 6, 15 n.2 (Tex. 1999).  A Ariparian owner@ is
one whose land is bounded by a river.  Id.  The term Alittoral@
means Abelonging to the shore,@ and a Alittoral owner@ is
one whose land borders an ocean, sea, or lake. Id. at 21 n.7.





[7]  ANavigable
waters@ are defined broadly in Texas and they include waters
within the tidewater limits of the Gulf of Mexico and streams that are
navigable in law or fact.  See State v. Bradford, 121 Tex. 515, 50
S.W.2d 1065, 1069 (Anavigable waters@
includes Anavigable streams, as defined by statute, lakes, bays,
inlets, and other areas within tidewater limits within its borders@); Lorino, 175 S.W.2d at 413 (AThe bays inlets, and other waters along the Gulf Coast
which are subject to the ebb and flow of the tide of the Gulf of Mexico are
defined as Anavigable waters.@). 






[8]  The trial court concluded that, as Tract 1 became
submerged below the line of mean high tide, ownership of that submerged
property passed to the Port pursuant to Texas law and the provisions of the Act
of April 5, 1927.  THI contends the trial court=s interpretation of the 1927 Act was in error, because its ruling that
Tract 1 reverted to the State conflicts with the following language of section
4 of the Act:  

 

The purposes and provisions of the Act, and the
grants, rights and privileges, thereunder to [Port], shall not affect, curtail
or abridge the rights of riparian owners of lands abutting upon the islands and
lands subject to overflow, and lands lying under the streams, bays and lakes
herein described or referred to, as the same existed under the Common Law or
the Constitution or Statutes of Texas at the time this Act shall become in
force and effect, or to deprive riparian owners of access to such streams,
channels or waterways.

 

However, we do not read this section to abridge any of
the general rules of riparian or littoral rights applied here.  In fact, the
Act did not cause THI to lose title; these well-established rules caused THI=s loss.  The only relevant question is the location of
the line of mean high tide.  The Act merely fixed the ownership of the property
in the Port once the property became submerged below the line of mean high
tide. 





[9]  The trial court also concluded that the waters of
Old River and the San Jacinto River are navigable in law, because the waters
are tidally influenced and the rivers average more than 30 feet in width from
their mouths up, citing Lorino, 175 S.W.2d at 413, Bradford, 50
S.W.2d at 1069, and Texas Natural Resources Code section 21.001(3). 





[10]  Mean high tide is measured by taking an average of all the daily
highest readings over a long period.  Luttes, 324 S.W.2d at 174.  Mean
high tide is the same as mean high water.  See id.





[11]  A different rule is usually applied in the case of
the sudden removal or deposit of land; this rapid or perceptible change is
termed Aavulsion.@  York,
532 S.W.2d at 952.  Generally, title does not pass by avulsion.  Id. 
Nor may a landowner acquire title to accreted land by artificially building up
submerged land into dry land along his shoreline.  Brainard, 12 S.W.3d
at 19; York, 532 S.W.2d at 952.





[12]  THI also cited an attorney general opinion, but it
was not highly relevant to the resolution of the issues before us.  See Op.
Tex. Att=y Gen. No. GA-0181 (2004).





[13]  Under this section of its brief, THI also argues
another exception to the presumption that the State owns submerged tidal lands
by suggesting that when the water is only tidally influencedCnot tidalCthe
typical cases involving land subject to tide waters do not apply.  Relying on
the opinion of one of its experts, THI argues that the environment of Tract 1
is Afluvial,@
meaning it is dominated by the processes of river water moving downstream,
rather than littoral, meaning dominated by wave or tide-induced processes, and
the area is not a bay, inlet, or arm of the Gulf of Mexico.  Although the Port=s expert acknowledged that the area is affected by
fluvial processes, he described the site as a Acoastal environment,@ in which the
waters of Old River and the San Jacinto River are brackish, tidally influenced
estuaries of the Gulf.  Moreover, we find no exception made in the case law for
tidally influenced water and THI.  The Texas Supreme Court in Kenedy
Memorial Foundation makes it clear that only a very little movement of
water suffices for tide-water cases to apply.  See 90 S.W.3d at 280
(applying the line of the tide where Aseawater
inundation is regular, shallow, and somewhat infrequent@); see also Crary v. Port Arthur Channel & Dock
Co., 92 Tex. 275, 47 S.W. 967, 970 (1898) (holding the phrase Awaters of the gulf of Mexico@ was Acomprehensive@ and Asufficiently
broad to embrace at least all bays, inlets, and streams upon the Gulf Coast to
the extent to which they are subject to the ebb and flow of the tide@).  Consequently, this argument also does not overcome
the general presumption.





[14]  THI dismisses this footnote.  It asserts it is not a holding of the
Texas Supreme Court, but only the author=s personal opinion.  Although that part of the footnote
expressing the author=s personal opinion is not a holding
of the court, it is some indication of the facts the court considered
important.





[15]  The court of appeals had applied a rule in favor of
York which assumed the boundaries of the 28.083 acres were identified, and the
Water Authority did not contest this issue.  532 S.W.S.W.2d at 952. Nor did the
Water Authority claim any erosion of the subsided shelf.  Id.  The
supreme court therefore assumed that the property=s boundaries were identifiable and there had been no erosion of the
3.353 acres.  Id.  Thus, York did not address a situation
involving land affected by subsidence and other processes like erosion.





[16]  THI claims tide waters must have covered the York
property because it was in the same general area as Tract 1 but south of
Tract 1, meaning that it was closer to Galveston Bay and the Gulf.  Yet, as we
have noted, the York court stated quite explicitly that it assumedCand  expert testimony showedCthat tide waters did not affect the property.  Id. at
951. 





[17]  This finding is significant because it relates
directly to whether the property eroded or subsided.  According to at least one
of the experts, if Tract 1 had merely subsided, it simply would have dropped
and its boundaries would have remained relatively intact.





[18]  According to THI, by stipulation it owned record
title to Tract 1; so, because the Port sought to divest THI=s record title, the burden should have been on the
Port and Kirby to prove the Port held a superior right to THI=s title.  THI pursued a trespass to try title claim as
a counterclaim.  The Texas Supreme Court recently held that a trespass to try
title suit is the proper cause for all land title disputes, including boundary
disputes.  Martin v. Amerman, 133 S.W.3d 262, 264B67 (Tex. 2004).  THI is correct that one of the ways
to prevail in such a suit is Ato prove a
regular chain of conveyances from the sovereign,@ see id. at 265, but a trespass to try title plaintiff must also
prove the location and identity of the land.  See Hancock v. Moore, 137
S.W.2d 45, 50 (Tex. Civ. App.CEl Paso 1939), aff=d, 146
S.W.2d 369 (Tex. 1940).  As discussed in greater detail below, THI did not
prevail on those requirements.  





[19]  Merten testified that there were approximately
seventy LSLSes in Texas, and that they are qualified to file surveys and field
notes delineating boundaries between State and private land with the General
Land Office.  A Registered Professional Land Surveyor (ARPLS@), in contrast,
is not qualified to file such surveys.  According to Merten, there are about
2,500 RPLSes in Texas.  





[20]  THI also contends the trial court should have
considered the deposition testimony of Sid Bouse, a surveyor initially
designated by the Port and then de-designated in favor of Nedra Foster, who
testified that he would use a similar method to find submerged boundaries.  If
the trial court did not consider this testimony with the other evidence THI
presented and determined Merten=s survey to be
unreliable, THI contends this constitutes an abuse of discretion.  However, the
trial court does not abuse its discretion merely because it determines the
correctness of conflicting expert opinions in a way one party does not like. 
Additionally, the court limited both parties to one expert on this issue,
which, in its discretion, it could do.





[21]  THI also points to a survey prepared by F.G.
Huffman, an RPLS, who also surveyed the northern and western boundaries for THI
in 2002.  Merten testified that Huffman used a probing technique from a boat to
lcate the purported submerged boundaries.  The parties dispute whether Huffman=s survey was consistent with Merten=s.  THI ultimately chose Merten over Huffman as their
designated surveyor, and did not call Huffman at trial.





[22]  AThe Big Empty@ was the name of the area where Kirby operated its
barge fleeting business, located to the north and east of and adjacent to Tract
1. 





[23]  Dr. Sherman testified in part:

 

I don=t know where the sediment would come from.  We=ve seen the reports that 80-plus percent of the
sediment supplied by this river is blocked out by the Lake Houston Dam.  We
have to add on to that but Lake Houston Dam takes out probably a hundred
percent of the sand supply.  I mean, we would of had to have an incredible
scavenging of the flood plain to get all this material.  Even if we accepted
that, there=s no reason for it to make a pile here and nowhere
else on this part of the basin.





[24]  THI also claims that the trial court imposed an Airrebuttable presumption@ of state ownership of submerged lands that could not be overcome.  We
disagree that the trial court imposed an Airrebuttable
presumption@ against it.  The trial court simply held against THI
on crucial fact findings. 





[25]  In effect, THI would have us hold that any amount of
subsidence precludes the application of the general law applied to land under
tide waters.  This we refuse to do. 





[26]  York cites the three older cases in support
of its statement that submergence does not necessarily destroy the title of the
owner.  See York, 532 S.W.2d at 953B54.





[27]  To give a better visual of the location of the
boundaries, assuming the property is very loosely in the shape of a triangle,
we know the location of the vertical line (the Jones-Hare line), which is on
the right side of the triangle, we know only in a very general sense the
location of the diagonal (meandering) line (the meanders of the Old River to
the north and west, which have been eroded away), and now we are attempting to
set the location of the horizontal line at the bottom of the triangle (the
south line of the J.T. Harrell survey).





[28]  To the extent we have already addressed these two
issues in Part 1 of this opinion, we will not revisit them; we will address
only THI=s issues concerning the placement of the south line of
the J.T. Harrell survey.





[29]  Apparently, Trott=s
survey reflected an erroneous belief that the Harris/Carpenter grant extended
north to a common boundary with the Harrell grant.  A vacancy was later found
to exist between the Harrell grant and the actual north boundary of the
Harris/Carpenter.  Therefore, the call for adjoinder to the Harris/Carpenter
survey cannot be relied upon to find the southwest corner of the J.T. Harrell
Survey. 





[30]  If one were to imagine three rectangles stacked
neatly one on top of the other, the top rectangle represents the W.T Carter
survey, the middle rectangle represents the Buehler survey, and the bottom
rectangle represents the Garrett survey.  The top horizontal side of the top
rectangle is the south line of the J.T. Harrell survey and the left vertical
sides of the three rectangles form a single vertical (north-south) line.





[31]  Niedermier sold a one-half interest in her
730.6-acre tract to the Port in 1952.  In 1979, the Port condemned the
remaining half interest in the uplands of the 730.6-acre tract then owned by
the Carter Heirs.  THI does not dispute that the Port owns all of the property
immediately south of the south line of the Harrell survey.





[32]  Merten used Boyles=s 1936 survey to find the general area from which he located the
southwest corner, but otherwise he rejected Boyles=s work as Ahighly
unreliable@ to use in locating the south line.





[33]  Merten actually did two surveys, one in May of 2003,
and one in September of 2003.  He testified that in the September 2003 survey,
he placed the south line 10 feet further north than he did in the May 2003
survey.  He also moved the Jones-Hare line 23 feet further east, to be in
agreement with the other surveyors=
placement of the line.  According to Foster, Merten also placed the southwest
corner in May 2003 some 137 feet away from where he placed it in September
2003, and his final placement of the point was 83 feet east of Boyles= and Foster=s
location of the point.  THI relies on the second survey.  





[34]  In support of these arguments, THI cites Gill v.
Peterson, 126 Tex. 216, 86 S.W.2d 629 (1935); Wood v. Stone, 359
S.W.2d 68 (Tex. Civ. App.CHouston 1962, writ ref=d n.r.e.); Teal v. Powell Lumber Co., 262 S.W.2d 223 (Tex. Civ.
App.CBeaumont 1953, no writ); and Boyt v. Weiser,
180 S.W.2d 953 (Tex. Civ. App.CAmarillo 1944,
writ ref=d).  However, these cases merely illustrate that the
general rules have to be applied based on the court=s evaluation of the facts and evidence in each case. 
For example, in Gill, the court noted the general rule that Athe location of lines or corners of a survey may not
be established or controlled by artificial objects or marks not called for in
the field notes,@ but found no error in allowing the surveyor to
testify about where he placed marks not referred to in field notes when that
evidence aided in locating the surveyor=s
line.  Gill, 86 S.W.2d at 631, 632.  In Wood, the court found no
competent evidence that two tracts were adjacent when the junior surveyor was
shown to have no knowledge of the line of the senior survey or any common
corners.  Wood, 359 S.W.2d at 74B75. 
In Teal, the court held that a survey calling for the property to adjoin
that of a senior survey was not entitled to the presumption that the surveyor
actually surveyed and found the line of the senior survey when there was no
evidence the surveyor had any knowledge of the senior survey=s line or corners, and all competent evidence was to
the contrary.  Teal, 262 S.W.2d at 237B40.  Finally, in Boyt, the court held that a piece of flat iron,
first seen as a corner marker fifty-eight years after the original surveys of
the area were made, and which was not connected in any way to the surveys, was
no evidence of the corner=s location, and, because of the ambiguities in the
original surveys= field notes and uncertainty about the piece of flat
iron, the trial court properly admitted parol evidence to establish the south
line of the property at issue.  Boyt, 180 S.W.2d at 55B56.





[35]  Kirby has not contested the trial court=s denial of its motion for summary judgment that it
owns Tract 2.  Therefore, we are presented only with the question of whether
the trial court properly granted the Port=s
motion to determine THI did not own Tract 2, or if the trial court should have
granted THI=s motion.





[36]  THI mentions the Carter heirs= quitclaim deeds and adverse possession in its
Statement of Facts Pertaining to Tract 2.  However, it provides no argument,
and no appropriate citations to the record and authorities regarding these
theories of ownership.  Therefore, they are not properly presented on appeal.





[37]  By AJ.T. Harrell
line@ we refer to the trial court=s placement of that line, which we affirmed in Part II
of this opinion.